JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, a nombre de la UNIÓN DE EMPLEADOS DE MUELLES DE PUERTO RICO, peticionaria, *v.* NEW YORK & PORTO RICO STEAMSHIP CO., demandada.

Núm. 11.—*Sometido:* Febrero 9, 1949. *Resuelto:* Marzo 31, 1949.

*Yamil Galib Frangie, Ramón Olivo Nieves* e *Iram R. Cancio Vilella*, abogados de la peticionaria; *Charles R. Hartzell, Rafael O. Fernández* y *José L. Novas*, abogados de la demandada; *C. H. Juliá*, a nombre de la Unión de Empleados de los Muelles de Puerto Rico.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

Ésta es una petición de la Junta de Relaciones del Trabajo de Puerto Rico a nombre de la Unión de Empleados de Muelles de Puerto Rico contra The New York & Porto Rico Steamship Company solicitando pongamos en vigor un laudo de arbitraje. Se radicó dicha petición ante este Tribunal a tenor con el artículo 9(2)(c) de la Ley Insular de Relaciones del Trabajo.(1)

Miguel A. Torres y Armando Farrulla son miembros de la unión y eran empleados de la compañía en calidad de dependientes. El 9 de mayo de 1947 la compañía le escribió a la unión lo siguiente: "Como seguramente ustedes sabrán ya, los dependientes A. Farrulla y M. A. Torres fueron detenidos por la F.B.I. desde el miércoles por la tarde. Hasta tanto este asunto sea esclarecido estos dos empleados han sido suspendidos del trabajo, lo cual informamos a ustedes para su gobierno."

El 18 de julio de 1947 Farrulla y Torres fueron acusados por el gran jurado de la Corte de Distrito de los Estados Unidos para Puerto Rico. La acusación les imputaba una infracción de la sección 409 del Título 18 del Código de los Estados Unidos, consistente en haber hurtado de un muelle de la compañía dos cajas de mercancía que formaban parte de una carga interestatal.

Los acusados fueron juzgados ante tribunal de derecho, y absueltos el 29 de diciembre de 1947. Mientras estuvieron

(1)El artículo 9(2)(c) de la Ley núm. 130, Leyes de Puerto Rico, 1945, enmendada por la Ley núm. 6, Leyes de Puerto Rico, 1946 ((1) pág. 19), prescribe lo siguiente: "A los fines de promover la negociación colectiva, la Junta podrá, en el ejercicio de su discreción, ayudar a poner en vigor laudos de arbitraje emitidos por organismos competentes de arbitraje, bien designados de acuerdo con cualquier convenio colectivo firmado por un patrono y una organización obrera, o en virtud de cualquier acuerdo firmado por una organización obrera y un patrono. Después de emitido un laudo de arbitraje, la Junta, a solicitud de cualquiera de las partes en el procedimiento de arbitraje, podrá dar su consejo o podrá, si fuere requerida para ello, a nombre de la parte que lo solicite, entablar acción legal adecuada ante la Corte Suprema de Puerto Rico para que se ponga en vigor el laudo de arbitraje."

bajo acusación, ni los dependientes ni la unión solicitaron que la compañía los repusiera. Pero el día siguiente a la absolución la unión le escribió a la compañía recabando la reposición de Farrulla y de Torres y el pago de "todos los salarios dejados de percibir por los empleados envueltos en este caso, desde la fecha de la suspensión hasta la fecha en que vuelvan a trabajar." El 9 de enero de 1948 la compañía contestó que "luego de practicada una investigación por esta compañía de los hechos que dieron lugar a la suspensión de empleo y sueldo de los dependientes en cuestión, hemos llegado a la conclusión de que los Sres. Torres y Farrulla fueron negligentes en el desempeño de sus deberes y que en su consecuencia no pueden volver a ser empleados por esta compañía."

Las causas por las cuales la compañía puede despedir a sus empleados, incluyendo incompetencia, se especifican en el convenio colectivo firmado por la compañía y la unión. El convenio dispone el arbitraje de controversias que surjan del mismo, incluyendo despidos que los empleados consideren improcedentes. Y el convenio expresamente dispone que todos los laudos de arbitraje serán finales y obligatorios.

El 8 de marzo de 1948 la compañía y la unión firmaron una estipulación sometiendo a arbitraje, de conformidad con el convenio colectivo, la siguiente cuestión:

"La Unión pide la reposición de los empleados Miguel Ángel Torres, Armando Farrulla [otros dos que no están envueltos aquí], y además la paga de sus salarios correspondientes a todo el tiempo que permanezcan cesantes."

El convenio de sumisión disponía la paga retroactiva a pesar de que el convenio colectivo guarda silencio sobre este punto. La estipulación seguía el convenio colectivo al disponer que la decisión del Comité de Arbitraje sería final y obligatoria para las partes.

El Comité celebró vistas, en las cuales las partes sometieron evidencia. El 21 de junio de 1948 una mayoría del

Comité ordenó la reposición de Torres y Farrulla. Concluyó que éstos habían sido negligentes en el desempeño de sus deberes, pero que bajo las propias reglas de la compañía, su negligencia justificaba solamente una semana de suspensión pero no la cesantía. Por consiguiente ordenó a la compañía que pagase a Torres y a Farrulla sus salarios a partir de la fecha de suspensión, 9 de mayo de 1947, hasta la fecha de la reposición, luego de deducir paga por una semana de suspensión.

La compañía no dió cumplimiento al laudo de arbitraje. Entonces la Junta radicó esta petición para ponerlo en vigor. En oposición a la petición la compañía levanta cinco contenciones.

I

■■■■■ Sostiene la compañía que la Junta Nacional de Relaciones Obreras tiene jurisdicción exclusiva sobre este caso, en virtud de la sección 10(a) de la Ley de Relaciones Obrero–Patronales, 61 Stat. 136, 29 U.S.C., suplemento I, secciones 141 et seq., conocida corrientemente como la Ley Taft–Hartley.

Rechazamos esta contención por dos motivos. En primer lugar, suponiendo arguendo que ésta sea una solicitud para corregir una práctica ilícita de trabajo, la Junta Nacional no tiene jurisdicción exclusiva sobre este caso específico.

La compañía está sujeta a la Ley Taft–Hartley. En su consecuencia, la sección 10(a) confiere a la Junta Nacional jurisdicción exclusiva si la compañía comete cualquiera de las prácticas ilícitas enumeradas en la sección 8 de dicha Ley. Amazon Cotton Mill Co. v. Textile Workers Union, 167 F.2d 183 (C.C.A. 4, 1948); National Labor Relations Board v. González Padín Co., 161 F.2d 353 (C.C.A. 1, 1947). Pero "el haber enumerado la Ley Wagner y la Ley Taft–Hartley las prácticas ilícitas de trabajo, sobre las cuales tiene jurisdicción exclusiva la Junta Nacional, no priva a los estados de poner en vigor sus propias políticas en cuestiones no com-

prendidas en la ley federal . . . " *Algoma Plywood and Veneer Co.* v. *Wisconsin Employment Relations Board,* 336 U.S. 301, 303–315.

 El presente caso es un procedimiento para poner en vigor un laudo de arbitraje. La infracción de un convenio colectivo, incluyendo el acuerdo de aceptar un laudo de arbitraje, constituye una práctica ilícita de trabajo bajo el artículo 8(1)(f) de la Ley insular. Pero eso no es cierto bajo la Ley Federal. Ni la Ley Nacional de Relaciones del Trabajo, 49 Stat. 449, 29 U.S.C. secs. 151 *et seq.,* corrientemente conocida como la Ley Wagner, ni la Ley Taft–Hartley, proveen que será práctica ilícita de trabajo el que un patrono deje de cumplir con un laudo de arbitraje. 59 Harv.L.Rev. 976, 977. Estas dos leyes tratan principalmente de crear condiciones que permitan a las partes llegar a un acuerdo. Nada tienen que ver con el cumplimiento de convenios propiamente dichos. En términos generales dichas leyes dejan la ley sobre esta cuestión como estaba antes de la aprobación de las mismas. Magruder, *Development of Collective Bargaining,* 50 Harv.L.Rev. 1071, 1112.([2]) Toda vez que la Ley Taft–Hartley no dice que será práctica ilícita de trabajo el negarse a cumplir con un laudo de arbitraje, no existe conflicto entre ella y el inciso 8(1)(f) y por consiguiente dicho inciso puede ponerse en vigor aun contra un patrono que esté sujeto a la Ley Federal, no obstante las disposiciones del inciso 10(a) de esta última ley. *Algoma Plywood and Veneer Co.* v. *Wisconsin Employment Relations Board,* supra; *Interna-*

---

([2]) *Cf. National Labor Relations Board* v. *Newark Morning Ledger Co.,* 120 F.2d 262 (C.C.A. 3, 1941), certiorari denegado, 314 U.S. 693; *Timken Roller Bearing Co.* v. *National Labor Relations Board,* 161 F.2d 949, 954 (C.C.A. 6, 1947). Bajo el caso de *Newark* el despido por dedicarse a actividades unionales *es* una práctica ilícita de trabajo bajo la Ley Wagner o la Taft–Hartley, aun cuando el despido ocurra después de que las partes han firmado un convenio colectivo. Pero eso no afecta el presente caso. Aquí el despido fué, según se alega, por causa justificada. Si bien la unión afirma que no hubo tal causa, no alega que el despido se debió a actividades unionales. Por consiguiente, aun bajo el caso de *Newark,* este despido no podría ser la base para un caso de práctica ilícita de trabajo bajo la Ley Taft–Hartley.

*tional Union, U.A.W., A.F. of L., Local 232 et al.* v. *Wisconsin Employment Relations Board et al.*, 336 U.S. 245; *Allen–Bradley Local* v. *Wisconsin Employment Relations Board*, 315 U.S. 740. Véanse también, 61 Harv.L.Rev. 840; 60 Harv.L.Rev. 262; *Chabrán* v. *Bull Insular Line*, 69 D.P.R. 269, 291, y casos citados. Por las razones expuestas en el caso de *Algoma*, no son de aplicación aquí los casos de *Bethlehem Steel Co. et al.* v. *New York State Labor Relations Board*, 330 U.S. 767, y *La Crosse Telephone Corp.* v. *Wisconsin Employment Relations Board*, 336 U.S. 18, 93 L.ed. 265.

■■ Existe un segundo motivo para rechazar la contención de que carecemos de jurisdicción sobre este caso. Aun cuando el Congreso hubiera prohibido a las Juntas estatales corregir prácticas ilícitas de trabajo no comprendidas en la Ley Federal, todavía tendríamos jurisdicción sobre este caso en particular. Esto es así, porque, contrario a la suposición que hicimos *arguendo* al discutir el primer motivo, éste no es un procedimiento bajo la Ley insular para corregir una práctica ilícita de trabajo. Más bien es simplemente un pleito privado ante una corte local para obtener el cumplimiento de un contrato. Y no fué la intención del Congreso despojar a las cortes locales de su jurisdicción en tales casos.

De nuestra Ley y la naturaleza de este caso surge claramente que éste es un pleito para hacer valer derechos privados y no un procedimiento para corregir una práctica ilícita de trabajo. El artículo 8(1) de nuestra Ley enumera las prácticas ilícitas del trabajo que un patrono puede cometer. El artículo 8(1)(f) dice que será práctica ilícita del trabajo el que un patrono no cumpla con un acuerdo para aceptar un laudo de arbitraje. Pero la Junta no procedió contra la compañía por infracción del artículo 8(1)(f). De haberlo hecho, hubiera venido obligada a expedir una querella, celebrar una vista y expedir una Decisión y Orden, que hubiera sido final y obligatoria para las partes, a menos que fuera

revocada por este Tribunal. La Junta hubiera estado actuando en una capacidad cuasi judicial. Y hubiera resuelto si se cometió una práctica ilícita de trabajo y qué resarcimiento debiera conceder. Véanse los artículos 9(1)(a)(b); 9(2)(a)(b). Además, el dejar de cumplir con la Orden de la Junta hubiera hecho aplicables las sanciones adicionales provistas en el artículo 11. Véase 59 Harv.L.Rev. 976, 981–2.

Sin embargo, en vez de imputarle una violación del artículo 8(1)(f) y proceder a la celebración de una vista y a la expedición de una decisión de la Junta bajo el artículo 9(1)(a)(b) sujeta a revisión por este Tribunal bajo el artículo 9(2)(a)(b), la Junta radicó una petición original ante este Tribunal bajo el artículo 9(2)(c). El artículo 9(2)(c) no contempla impedir prácticas ilícitas de trabajo propiamente dichas. Es cierto que la sección 9 se titula "Prevención de Prácticas Ilícitas de Trabajo", y que las disposiciones restantes del artículo 9 caen propiamente dentro de dicho título. Pero resta el hecho de que los términos del artículo 9(2)(c) claramente demuestran que éste nada tiene que ver con evitar prácticas ilícitas de trabajo. Como hemos visto, dondequiera que se imputa una práctica ilícita de trabajo, la Junta dicta una decisión en la que resuelve si el patrono ha cometido o no dicha práctica ilícita de trabajo y si es necesario le ordena que desista de ella y que tome tal acción afirmativa que permita efectuar los propósitos de la ley. Pero bajo el artículo 9(2)(c) la Junta no le imputa al patrono la comisión de una práctica ilícita de trabajo y no rinde decisión resolviendo la controversia. Por el contrario, actúa como agente o representante de la parte victoriosa cuando radica un recurso ante este Tribunal para obligar el cumplimiento de un contrato en el cual la parte perdidosa se comprometió a aceptar, pero que no acepta ahora, el laudo de arbitraje.

■ También se le pudo imputar a la compañía, con los mismos hechos como base, haber realizado una práctica ilícita de trabajo en violación del artículo 8(1)(f). Pero eso hu-

biera sido una imputación que envolvía política *pública*. Recientemente dijimos que en tales casos la Junta actúa para defender la política pública, y no meramente para hacer valer derechos privados o deberes como ocurre aquí. *Quiñones Bird et al.* v. *Junta de Relaciones del Trabajo de Puerto Rico,* ante, pág. 593. El dejar de cumplir con una Decisión y Orden de la Junta en tal caso conllevaría las sanciones adicionales establecidas por el artículo 11. En este caso la Junta ni formuló ni decidió tal cargo. Y la compañía no tiene que preocuparse por las sanciones adicionales del artículo 11. En el caso de autos Torres y Farrulla sólo tratan de hacer valer sus derechos *privados* bajo el convenio colectivo y el acuerdo de sumisión y el laudo de arbitraje dictado en virtud de aquéllos. El hecho de que bajo el artículo 9(2)(c) la Junta comparezca como su representante ni aumenta ni disminuye sus derechos. Tampoco cambia la naturaleza de su remedio. A este respecto, la situación es análoga a los casos en que mediante estatuto los abogados del Departamento del Trabajo insular representan a los empleados en acciones para recobrar salarios adeudádosles.

Nos damos cuenta de que la Junta actúa bajo el artículo 9(2)(c) para "promover la negociación colectiva . . . ". Pero esto no altera el hecho de que el procedimiento bajo el artículo 9(2)(c) contempla hacer valer mediante acción judicial los derechos privados que emanan de un contrato y no determinar si la compañía ha violado la política pública al llevar a cabo una práctica ilícita de trabajo prohibida por el artículo 8(1)(f).

Nada hay en nuestra ley local que impida esta acción como pleito privado. Un empleado o una unión que lo represente puede demandar a un patrono ante las cortes para obligarlo a cumplir con las disposiciones de un convenio colectivo.(3) Este caso cae dentro de esa doctrina toda vez que es

---

(3) Rice, *Collective Labor Agreements,* 44 Harv.L.Rev. 572; Simpson, *Fifty Years of Equity,* 50 Harv.L.Rev. 171, 200–201; *Notes,* 51 Harv.L.Rev. 520; Witmer, *Collective Labor Agreements in the Courts,* 48 Yale L.J. 195; Freidin

un pleito entablado por una unión, representada por la Junta, a nombre de dos de sus miembros, con miras a poner en vigor un laudo de arbitraje expedido en virtud de un convenio colectivo. Véase *Ríos* v. *Puerto Rico Cement Corp.*, 66 D.P.R. 470.

■ Tampoco hay nada en la Ley Federal que prohiba este pleito privado. Aun cuando, contrario al presente caso, los hechos demostraran una práctica ilícita de trabajo bajo la Ley Federal, la jurisdicción exclusiva de la Junta para proteger el derecho *público* en tal caso no impide necesariamente un pleito en las cortes locales por un empleado para proteger sus derechos *privados*. *National Labor Relations Bd.* v. *Newark Morning L. Co.*, supra; *National Labor Rel. Board* v. *Walt Disney Productions*, 146 F.2d 44 (C.C.A. 9, 1944); *National Labor Relations Bd.* v. *American White Cross Lab.*, 160 F.2d 75 (C.C.A. 2, 1947); Gregory, supra, pág. 467. *Cf.* *Quiñones* v. *Junta de Relaciones del Trabajo*, supra.([4])

y Ulman, *Arbitration and the War Labor Board*, 58 Harv.L.Rev. 309, 337–41; Freidin, *The Public Interest in Labor Disputes*, 12 *Law and Contemporary Problems* 367, 379–80; Gregory, *The Enforcement of Collective Labor Agreements by Arbitration*, 13 U.of. Chi.L.Rev. 445; *Annotation*, 156 A.L.R. 652; *Freydberg Bros., Inc.*, v. *Corey et al.*, 31 N.Y.S.2d 10 (1941), confirmado, en 32 N.Y.S.2d 129; casos citados en la opinión disidente del Juez Clark, *National Labor Relations Bd.* v. *Newark Morning L. Co.*, supra, 269 *et seq.* (C.C.A. 3, 1941); véase *J. I. Case Co.* v. *Labor Board*, 321 U.S. 332, 336.

([4]) En el caso de *Newark* la corte resolvió en reconsideración que el despido de un empleado por dedicarse a actividades unionales, luego de haber las partes firmado un convenio colectivo, constituía una práctica ilícita de trabajo en la cual podía intervenir la Junta Nacional de Relaciones del Trabajo. No cae dentro de nuestra incumbencia determinar si la opinión de la mayoría es más lógica que la disidente. Véanse 51 Yale L.J. 501; 90 U.of Pa.L.Rev. 107; Anotación, 137 A.L.R. 867; Cox, *Some Aspects of the Labor Management Relations Act*, 1947, 61 Harv.L.Rev. 274, escolio 9. Para nosotros lo importante es que aun la opinión de la mayoría aclara a la pág. 268 que la jurisdicción exclusiva de la Junta Nacional bajo la Ley Wagner para proteger el derecho público en tal caso, no impide necesariamente un pleito en las cortes entablado por el empleado para proteger sus derechos privados.

En su opinión disidente en el caso de *Newark*, el Juez Clark afirma que la Junta no tiene jurisdicción. Pero también, con un sinnúmero de citas a las págs. 270–72, él conviene con nuestro criterio de que un empleado agraviado

■ La regla expuesta en el párrafo anterior se aplica aun con más fuerza cuando el demandante, como ocurre aquí, radica un pleito privado para hacer cumplir un laudo de arbitraje expedido en virtud de un convenio colectivo. Es cierto que la Ley Taft–Hartley no dice que será práctica ilícita de trabajo la infracción de un convenio colectivo, incluyendo el no cumplir con un laudo de arbitraje expedido en virtud de tal convenio. Pero tanto la Ley Wagner como la Taft–Hartley tienen por miras estimular la negociación colectiva. Y el arbitraje es parte del procedimiento de negociación colectiva. *Timken Roller Bearing Co.* v. *National Labor Rel. Bd.*, supra, pág. 954. Además, la Ley Taft–Hartley insiste una y otra vez en el uso de convenios y procedimientos voluntarios para resolver disputas obrero–patronales. Esto incluye un convenio colectivo que tiene el arbitraje voluntario como el paso final para decidir quejas y disputas que surjan del convenio. Braden, *Problems in Labor Arbitration*, 13 Mo.L.Rev. 143, 166; véase *International Union* v. *Colonial Hardwood Floor Co.*, 168 F.2d 33, 35 (C.C.A. 4, 1948)(⁵). Por tanto difícil-

tiene el derecho de reposición mediante pleito privado en las cortes corrientes para hacer cumplir un convenio colectivo tal cual éste se aplica a él. Y véanse *National Labor Relations Bd.* v. *Stackpole Carbon Co.*, 128 F.2d 188, 190–1 (C.C.A. 3, 1942); Anotación, 42 A.L.R. 727; *Rhodes* v. *New Orleans Great Northern R. Co.*, 91 So. 281 (Miss., 1922); *Baird Bros.* v. *Minneapolis & St. L.R. Co.*, 165 N.W. 412 (Ia., 1917).

(⁵)La sección 201(*a*) del Título II de la Ley Taft–Hartley dispone que es la política de los Estados Unidos el que el bienestar de la nación pueda estar mejor asegurado mediante convenios colectivos. Sigue diciendo la sección 201(*b*) que las transacciones mediante convenios colectivos pueden ayudarse grandemente ofreciendo el gobierno todas las facilidades de conciliación, mediación y arbitraje voluntario. Esta es la única mención directa que la Ley contiene en cuanto a arbitraje. Pero además de urgir la transacción voluntaria de las disputas a través de toda la ley, la sección 10(*k*) estimula el arbitraje de disputas jurisdiccionales. Y la sección 302, inciso *c*(⁵)(*b*), provee el arbitraje en relación con los fondos que la unión invierte para el bienestar de sus obreros. Véase Braden, supra, págs. 165–67. Según *Gotshal, Arbitration and Its Possibilities and Limitations Under the Taft–Hartley Law*, 2 Arb.J. 318 (1947), según aparece citado en Braden, supra, pág. 167, "el arbitraje asumirá un papel más importante bajo la Ley Taft–Hartley, y . . . servirá para resolver, como paso final en procedimientos de agravios bien organizados, un número mucho mayor de controversias industriales."

mente puede sostenerse que el poner en vigor un laudo de arbitraje en alguna forma esté en pugna con la Ley Taft–Hartley, especialmente donde, como en el presente caso, la Junta Nacional no tiene jurisdicción de la negativa a cumplir el laudo como una práctica ilícita de trabajo. Anotación, 149 A.L.R. 276; Cox, supra, págs. 303–5; Updegraff y McCoy, *Arbitration of Labor Disputes* (1946) pág. 42. *Cf. Benedict* v. *Limited Editions Club, Inc.,* 39 N.Y.S.2d 852 (App.Div. 1943), comentado en 1 Teller, *Labor Disputes and Collective Bargaining,* Cum. Supp. sec. 181, pág. 127.

En vista de lo anterior, no podemos estar de acuerdo con la contención de la compañía al efecto de que carecemos de jurisdicción en este caso.([6])

## II

La compañía sostiene que la sumisión a arbitraje era defectuosa.

Una parte puede oponerse a la solicitud para que una corte ponga en vigor un laudo de arbitraje, si existe algún defecto o insuficiencia en la sumisión. *Ríos* v. *Puerto Rico Cement Corp.,* supra, pág. 477. El supuesto defecto en este caso fué que el convenio de sumisión no fué elevado a escritura pública. La compañía descansa en el caso de *Mas* v. *Elona,* 31 D.P.R. 30. En él resolvimos que (pág. 32) "no siendo aplicable ninguna otra ley", era de aplicación la Ley de Enjuiciamiento Civil española. Esta última dispone que un convenio de arbitraje habrá de formalizarse en escritura pública. *Cf. Noble* v. *Rodríguez et al.,* ante, pág. 482.

---

([6])Indicamos de paso que la compañía ha asumido la posición, consistente con nuestro criterio, de que las cortes tienen jurisdicción sobre este caso. El 18 de agosto de 1948 radicó demanda civil número 5210 contra los miembros del Comité de Arbitraje ante la Corte de Distrito de los Estados Unidos para Puerto Rico solicitando una sentencia declaratoria al efecto de que el laudo es nulo. Pero si la Junta Nacional tiene jurisdicción exclusiva sobre la materia, ni la corte de distrito Federal ni este Tribunal pueden considerar dicho asunto. *Cf. Amazon Cotton Mill Co.* v. *Textile Workers Union,* supra, citado por la compañía. La radicación de un pleito por la compañía ante la Corte Federal parece que está en conflicto con su punto de vista de que solamente la Junta Nacional puede considerar estas cuestiones.

El caso de *Mas* no es de aplicación porque tenemos otra ley aplicable al arbitraje de disputas obreras. En el artículo 9(2)(c) la Asamblea Legislativa dispuso que este Tribunal pondrá en vigor los laudos de arbitraje expedidos por árbitros nombrados a tenor con un convenio colectivo o con un acuerdo efectuado entre una unión y un patrono. Los artículos 8(1)(f) y 8(2)(a) contienen disposiciones similares. Estos incisos sólo requieren un acuerdo para arbitrar, no una escritura pública. Y fueron aprobados a la luz de la práctica corriente, de la cual tomamos conocimiento judicial, cual es formalizar convenios colectivos por documentos privados.

Resolvemos que el acuerdo para arbitrar no fué defectuoso simplemente porque no se elevó a escritura pública.

### III

Es innecesario detenernos a examinar la cuestión suscitada por la compañía al efecto de que la Junta abusó de la discreción conferídale por el artículo 9(2)(c) al radicar este procedimiento. Éste es un asunto que la Asamblea Legislativa dejó a la discreción de la Junta. No podemos ver sobre qué base podríamos resolver que tenemos derecho a sustituir nuestros puntos de vista en relación con tal decisión administrativa, por los de la Junta.

La compañía también incluye bajo este punto el argumento de que la petición no aduce hechos suficientes. Consideramos que este punto es tan frívolo que no amerita discusión alguna.

### IV

La compañía alega que el laudo es nulo debido a errores de derecho cometidos por el Comité de Arbitraje. El primer error de derecho señalado es que los hechos incontrovertidos demuestran que la compañía podía como cuestión de derecho, despedir a Farrulla y a Torres.

El récord no contiene la prueba presentada ante el Comité. La compañía descansa en la relación de hechos contenida en

la decisión del Comité que demuestra que el barco de la compañía llegó a Puerto Rico con carga consignada entre otros a la U.S. Rubber Export Company, R. Fabián & Co. y Laudelino Alonso & Co. El primero de mayo de 1947 un carrero de la U.S. Rubber acudió al muelle con un conocimiento de embarque solicitando el despacho de 115 bultos de mercancía, incluyendo 25 cartones de tubos de goma y 28 cajas de zapatos de goma. Torres entregó 115 bultos al carrero, incluyendo 23 cartones de tubos y 28 cajas de zapatos de goma. Al hacer el recibo de entrega exigido para el despacho de mercancía y salida del muelle, Torres figuró en el mismo 115 bultos. Pero incluyó 25 en vez de 23 cartones de tubos y 26 en vez de 28 cajas de zapatos de goma.

El 2 de mayo de 1947 un carrero se personó en el muelle con el conocimiento de embarque. Toda vez que faltaban por entregar dos cajas de zapatos, Farrulla entregó dos cajas por las cuales expidió un recibo de entrega a nombre de la U.S. Rubber. Esta última no recibió dichas dos cajas. En verdad, como ya se ha indicado, la U.S. Rubber había recibido ya el primero de mayo el cargamento completo de 28 cajas de zapatos de goma.

Luego la U.S. Rubber hizo una reclamación por los dos cartones de tubos que nunca recibió. Éstos fueron encontrados en el muelle 8 ó 10 días después, y entregados por un agente del FBI. Dos cajas de tejidos pertenecientes a Fabián & Co. y Alonso & Co. no pudieron encontrarse. Más tarde dichos consignatarios sometieron a la compañía sus reclamaciones, y la compañía aseguradora se las pagó.

Aparentemente la teoría del gobierno en la causa criminal ante la Corte Federal fué que Torres, Farrulla y un carrero se combinaron para robarse dos cajas de tejidos. El plan, según el gobierno, fué que en el recibo de entrega Torres haría figurar de más dos cartones de tubos entregados a la U.S. Rubber y haría figurar de menos dos cajas de zapatos entregadas también a dicha compañía. Al día si-

guiente, un carrero presentaría el conocimiento demostrativo de que la U.S. Rubber todavía tenía derecho a dos cajas de zapatos. Como cuestión de hecho todo el cargamento de zapatos había sido entregado el día anterior a la U.S. Rubber. En vez de dos cajas de zapatos, Farrulla entregaría al carrero dos cajas de tejidos. El gobierno sostuvo que el plan tuvo éxito.

La prueba ofrecida no convenció a la corte más allá de duda razonable, y los acusados fueron absueltos. Sin embargo, la compañía todavía tenía derecho a demostrarle al Comité de Arbitraje, si podía—independientemente de la cuestión de prueba más allá de duda razonable—que la negligencia o incompetencia de Farrulla y de Torres resultaron en pérdida de mercancía, y por lo tanto, justificaban su despido. El Comité concluyó que la prueba ofrecídale demostró que Farrulla y Torres habían sido negligentes. Pero resolvió que su negligencia sólo justificaba suspensión por una semana y no el despido.

Suponemos que la negligencia de Farrulla y de Torres era suficiente para justificar su despido a tenor con lo resuelto en el caso de *Blanes* v. *Tribunal et al.*, 69 D.P.R. 113. Pero la compañía no retuvo su derecho a despedir a sus empleados bajo la doctrina del caso de *Blanes*. Más bien en aras de la paz industrial voluntariamente limitó su derecho a despedir empleados a las causas enumeradas en el convenio colectivo. Lo que es más importante, en dicho convenio y en el acuerdo de sumisión la compañía voluntariamente renunció a su derecho de acudir a las cortes para que éstas determinaran los méritos de un despido específico, tanto en cuanto a los hechos como en cuanto a la ley. Phillips, *The Function of Arbitration in the Settlement of Industrial Disputes*, 33 Col.L.Rev. 1366, 1381-82. Convino que tales cuestiones deberían ser sometidas a un Comité de Arbitraje cuyos laudos serían finales y obligatorios para las partes. En efecto

la compañía nos pide ahora que dejemos sin efecto los contratos que ella de su propia voluntad firmó.

Un laudo de arbitraje no es ni un contrato ni una sentencia, pero disfruta de la naturaleza de ambos. Por consiguiente, los motivos por los cuales un laudo, basado en una sumisión voluntaria, puede ser impugnado se reducen a (1) fraude, (2) conducta impropia, (3) falta del debido procedimiento en la celebración de la vista, (4) violación de la política pública, (5) falta de jurisdicción, y (6) que el laudo no resuelva todas las cuestiones en controversia que se sometieron. Updegraff y McCoy, supra, págs. 124–27. Esto quiere decir que un laudo "no puede anularse por meros errores de criterio ya sean éstos en cuanto a la ley o en cuanto a los hechos." *Wilkins* v. *Allen,* 62 N.E. 575, 576 (N.Y. 1902).(⁷)

▮ Según indicó la Junta en la vista oral de este caso, ella o este Tribunal quizá hubieran llegado a una conclusión distinta si las cuestiones hubieran sido sometidas a ella o a nosotros. Pero las partes que firman un convenio de esta naturaleza deben comprender que han sustituído al árbitro por las cortes para la determinación de todas las cuestiones

---

(⁷)Al mismo efecto, *Motor Haulege Co.* v. *International Brotherhood, etc.,* 71 N.Y.S.2d 352 (1947); *Johnson* v. *Noble,* 13 N.H. 286, 38 Am.Dec. 485 (1842); *Roberts Bros.* v. *Consumers' Can Co.,* 62 A. 585 (Md., 1905); *Deshons* v. *Scott's Adm'r,* 260 S.W. 355 (Ky., 1924); *Marchant* v. *Mead–Morrison Mfg. Co.,* 169 N.E. 386, 392 (N.Y., 1929); *Koepke* v. *E. Liethen Grain Co.,* 236 N.W. 544 (Wis., 1931); *Housing Authority* v. *Henry Ericsson Co.,* 2 So.2d 195 (La., 1941); *In re Reynolds's Estate,* 20 S.E.2d 348 (N.C., 1942); *J. F. Fitzgerald Const. Co.* v. *Southbridge Water S. Co.,* 23 N.E.2d 165, 167 (Mass., 1939); Anotación, 112 A.L.R. 873; Braden, supra, pág. 150; Fraenkel, *Arbitration of Labor Disputes,* XVII N.Y.L.Q. 549, 558; Freidin y Ulman, supra, págs. 328, 354–55; Phillips, *Rules of Law or Laissez Faire in Commercial Arbitration,* 47 Harv.L.Rev. 590, 598–99, 602–3; Isaacs, *Two Views of Commercial Arbitration,* 40 Harv.L.Rev. 929; Comment, *Arbitration of Labor Interpretation Disputes,* 43 Ill.L.Rev. 678, 689–90.

Para las reglas que gobiernan en general el arbitraje de disputas obreras, véase 1 Teller, supra, secs. 178–85. Para la historia y desarrollo de la ley de arbitraje, véanse *Rueda* v. *Union Pac. R. Co.,* 175 P.2d 778 (Ore., 1946); *Park Const. Co.* v. *Independent School Dist. No. 32,* 296 N.W. 475 (Minn., 1941), opinión disidente, pág. 478 *et seq.*

de hecho y de derecho sustantivo. La compañía renunció su derecho a litigar tales cuestiones ante los tribunales. No estamos autorizados para devolvérselo.

Hacemos hincapié en que no estamos resolviendo que la compañía no estuvo justificada en despedir a Farrulla y a Torres. Su conducta fué negligente y sospechosa. Esto trajo como resultado el robo de mercancía. Quizás estos hechos formaban parte de una situación general que pudieron justificar a la compañía en tomar medidas drásticas. *Cf. Findings and Resolutions of the Grand Jury of the District Court of the United States for Puerto Rico, In re: Investigation of Thefts and Pilferages from Interstate Shipments,* radicado el 1 de noviembre de 1944. Pero la compañía renunció a su libertad de acción. Convino en acatar la sentencia de un comité de arbitraje sobre este punto. No hay manera alguna en derecho por la cual la podamos relevar de su compromiso.(8)

La situación sería diferente si el convenio colectivo o la sumisión a arbitraje hubieran provisto que el Comité de arbitraje deberá decidir las cuestiones sometídasle de acuerdo

---

(8)En *Ríos* v. *Puerto Rico Cement Corp.,* supra, dijimos a la pág. 477: "Un laudo de arbitraje ocupa una posición muy similar a la de una sentencia o decreto judicial. Como regla general puede ser impugnado o anulado si existe algún defecto o insuficiencia en la sumisión o en el laudo mismo que lo invalide, o cuando el procedimiento seguido se ha desviado de manera substancial y perjudicial de las reglas que gobiernan los procedimientos por y ante árbitros. Los tribunales no se inclinan fácilmente a decretar la nulidad de un laudo de arbitraje, y no deben permitir que los mismos sean impugnados a menos que contra ellos pueda levantarse una de las objeciones antes mencionadas o que se alegue y pruebe fraude o mala conducta o la comisión de un grave y perjudicial error que equivalga a una violación del derecho a un debido procedimiento de ley."

En vista de que la compañía descansa en este párrafo, creemos propio aclararlo. No fué nuestra intención resolver en el caso de *Ríos* que un laudo podía impugnarse por errores de derecho sustantivo. Por el contrario, nuestra intención fué resolver que si el árbitro actúa con jurisdicción solamente los errores de fraude, conducta impropia o falta del debido procedimiento, pueden invocarse ante las cortes en contra del laudo. A estos motivos, según indicamos antes, deben añadirse, violación de la política pública y el no resolver el laudo todas las cuestiones en controversia sometidas.

802

a derecho. "Cuando las partes así lo disponen, los árbitros deben seguir las reglas de derecho, y rendir sus laudos a tenor con las doctrinas legales prevalecientes. Si el convenio de arbitraje nada dice en cuanto a esto, de conformidad con la Ley Común y bajo la mayoría de las leyes de arbitraje, los árbitros pueden declarar cuál es la ley, y ningún laudo será anulado a causa de sus errores de derecho. . . . ". 6 Williston *on Contracts, Rev. ed.*, sec. 1929, pág. 5396; *Freydberg Bros., Inc.* v. *Corey et al.*, 31 N.Y.S.2d 10 (1941), confirmado en 32 N.Y.S.2d 129; *Loving & Evans* v. *Blick,* 177 P.2d 981 (Calif., 1947); *Wilkins* v. *Allen,* supra; *Shirley Silk Co.* v. *American Silk Mills,* 13 N.Y.S.2d 309 (1939); Phillips, supra, 47 Harv.L.Rev., a las págs. 603–4. Véase *Note,* 61 Harv.L.Rev. 1022. Una de las primeras autoridades sobre arbitraje es de la creencia que éste sería más efectivo si las cortes pudieran revisar los laudos sobre cuestiones de derecho sustantivo. Phillips, supra, 47 Harv.L.Rev., a las págs. 609 *et seq.* Pero en ausencia de una disposición en tal sentido en el convenio de arbitraje o en un estatuto, el árbitro tiene autoridad para hacer caso omiso de las reglas de derecho sustantivo.

En este caso ni el convenio colectivo ni el acuerdo de sumisión limitaron los poderes del Comité de Arbitraje. Por el contrario, ambos le confirieron poderes ilimitados. Y expresamente decían que su laudo sería final y obligatorio. Por tanto no tenemos autoridad para negarnos a poner en vigor el laudo porque el Comité haya cometido supuestos errores de derecho sustantivo. (⁹)

---

(⁹)Suponiendo que los artículos 1719, 1720 y 1715 del Código Civil sean de aplicación a este caso, llegaríamos al mismo resultado. Estos artículos autorizan la sumisión de disputas a un tercero, cuyas decisiones tendrán (artículo 1715) "la autoridad de la cosa juzgada . . . ".

Las disposiciones de los artículos 204–11 del Código de Enjuiciamiento Civil, ed. de 1933, se refieren a las decisiones de casos en las cortes emitidas por "referees". Nada tienen que ver con el arbitraje fuera de las cortes. *Mas* v. *Llona,* supra, pág. 34. Hacemos este comentario porque las palabras "referee" y "reference" han sido erróneamente traducidas en el texto español de dichos artículos como "árbitro" y "arbitraje".

 Seguidamente alega la compañía que el Comité se excedió en su jurisdicción. Precisamente porque un laudo de arbitraje es final y obligatorio, el árbitro no determina su propia jurisdicción, a no ser que las partes lo acuerden. Compete a las cortes y no al árbitro interpretar el convenio de arbitraje con el fin de determinar qué cuestiones fueron sometidas a arbitraje por las partes. Y los contratos sobre arbitraje serán minuciosamente interpretados con el propósito de no forzar a una parte a someter a arbitraje una cuestión que no fué su intención someter a arbitraje. *B. Fernández & Hnos., S. en C.* v. *Rickert Rice Mills, Inc.,* 119 F.2d 809, 814-15 (C.C.A. 1, 1941); *Texoma Natural Gas Co.* v. *Oil Workers I. U., etc.,* 58 F.Supp. 132, 146-47 (Tex., 1943), confirmado en 146 F.2d 62 (C.C.A. 5, 1944); *Ass'n of Master Painters, Etc.* v. *Brotherhood, etc.,* 64 N.Y.S.2d 405, confirmado en 66 N.Y.S.2d 626; Updegraff y McCoy, supra, págs. 63, 117; 6 Williston, supra, sec. 1929, págs. 5393-5.

 El primer punto que examinamos bajo este motivo es si el Comité excedió su jurisdicción al suspender a Torres y a Farrulla por una semana. Sostiene la compañía que lo único que se le sometió al Comité fué si ellos fueron erróneamente despedidos; que la necesaria implicación de su conclusión de que fueron negligentes era que el despido fué justificado; y que el convenio de sumisión no autorizó al Comité a cambiar la pena de despido a una semana de suspensión.

No encontramos convincente dicho argumento. En ausencia de una disposición expresa en contrario en el convenio colectivo o en el acuerdo de sumisión, el Comité tenía poder para resolver que aun si los hechos en los cuales la compañía predicaba el despido fuesen ciertos, el despido era una pena demasiado drástica, y para modificar la pena. *In re E. I. Du Pont de Nemours and Co., Inc., and Textile Workers Union,* 9 *Labor Arbitration Reports* 345 (1947); *In re Pyrene Mfg. Co. and United Electrical, Radio and Machine Workers,* 9 *Labor Arbitration Reports* 787 (1948). Pero véanse, *In re*

*Stockham Pipe Fitting Co. and United Steel Workers*, 1 *Labor Arbitration Reports* 160 (1946) y *Simon* v. *Stag*, 18 N.Y.S.2d 197 (1940), contra.([10])

Debemos tener en cuenta que la cuestión no es si el Comité emitió una decisión con la que nosotros estemos de acuerdo. Por el contrario, sólo tenemos que determinar si tenía jurisdicción para rendir una decisión de reposición con suspensión de una semana. Pudo haber repuesto a Torres y a Farrulla, sin suspensión alguna. No podemos ver por qué no los pudo reponer con una semana de suspensión.

Estamos de acuerdo con los puntos de vista contenidos en *Comment, Discharge and Discipline Cases in Labor Arbitration*, 43 Ill.L.Rev. 847 (enero–febrero, 1949), sobre esta cuestión. Dijo allí el autor a la pág. 856 que la "cuestión de si la acción disciplinaria se debió a 'justa causa' lógicamente incluye la cuestión de si 'justa causa' existió para la acción disciplinaria específica que se tomó. El contrato debe ser el factor determinante y si el contrato o el convenio de sumisión expresamente prohiben al árbitro modificar la pena, éste viene obligado por esta restricción a su autoridad. En ausencia de tal limitación específica, muchos árbitros creen sin embargo que ellos tienen derecho a alterar o modificar una pena cuando la encuentran muy severa, bajo todas las circunstancias del caso."

La compañía alega además que el Comité carecía de jurisdicción para conceder paga retroactiva al 9 de mayo de 1947. Sostiene que los términos del convenio de sumisión confirieron jurisdicción al Comité para conceder paga retroactiva a la fecha en que definitivamente fueron despedidos el 9 de enero de 1948, pero no al 9 de mayo de 1947, en que se les suspendió con motivo de su arresto por la acusación Federal.

La carta del 30 de diciembre de 1947 de la unión a la compañía solicitaba paga retroactiva al 9 de mayo de 1947. Pero

---

([10]) *Simon* v. *Stag* se critica adversamente en Fraenkel, supra, págs. 561–62.

esta comunicación unilateral no es concluyente. El convenio colectivo dispone el arbitraje de despidos supuestamente improcedentes, pero nada dice en cuanto a reposición con paga retroactiva. La única referencia a paga retroactiva consta del convenio de sumisión, que autoriza la paga "de sus salarios correspondientes a todo el tiempo que permanezcan cesantes." Al interpretar esta cláusula, encontramos que es significativo el hecho de que cuando la compañía escribió a la unión el 9 de mayo de 1947 al efecto de que Torres y Farrulla habían sido suspendidos hasta tanto el asunto sea esclarecido, ni ellos ni la unión protestaron o invocaron la cláusula de arbitraje del convenio colectivo, que exigía notificación inmediata de cualquier disputa o reclamación. Dieron aquiescencia a la posición de la compañía que obviamente era lo más razonable para todas las partes envueltas: los dependientes no podían trabajar mientras estuviesen bajo acusación de hurto de mercancía, que debían entregar a los consignatarios.

Fué sólo después que Torres y Farrulla fueron absueltos que la unión solicitó su reposición. El asunto era ya completamente distinto. No obstaculizaba sus empleos acusación Federal alguna. A pesar de su absolución, la compañía por primera vez los despidió formalmente. Entonces la unión, también por primera vez, invocó la cláusula de arbitraje del convenio colectivo.

Convenimos con la compañía en que la controversia surgió por primera vez el 9 de enero de 1948; que entonces Torres y Farrulla fueron despedidos por primera vez; que la unión invocó inmediatamente la cláusula de arbitraje del convenio colectivo; y que en vista de estas circunstancias, las partes tuvieron la intención mediante el convenio de sumisión, de autorizar la paga retroactiva solamente al 9 de enero de 1948.

Como hemos visto, debido a que las partes vienen obligadas por un laudo de arbitraje y las cortes no lo pueden

revisar en los méritos, un convenio de sumisión es interpretado minuciosamente para evitar la resolución de cuestiones que no fueron sometidas a arbitraje. Toda vez que el convenio de sumisión no le confiere claramente al Comité autoridad para conceder paga retroactiva con anterioridad al 9 de enero de 1948, el laudo no puede ser puesto en vigor en tanto en cuanto ordena paga retroactiva con anterioridad a dicha fecha.

 Sin embargo, el hecho de que un laudo sea nulo en parte, necesariamente no lo invalida en su totalidad. Se pondrá en vigor la parte válida, siempre y cuando que las varias disposiciones del laudo puedan subsistir por sí solas. 6 Williston, supra, sec. 1929, pág. 5395; *Geiger* v. *Caldwell*, 114 S.E. 497 (N.C., 1922); *J. F. Fitzgerald Const. Co.* v. *Southbridge Water S. Co.*, 23 N.E.2d 165 (Mass., 1939); *Clark Millinery Co.* v. *National Union Fire Ins. Co.*, 75 S.E. 944 (N.C., 1912). La disposición sobre reposición de este laudo puede separarse de la de paga retroactiva. Updegraff y McCoy, supra, págs. 117–18. En su consecuencia la parte válida referente a la reposición será puesta en vigor.

 Por otro lado, la concesión de paga retroactiva al 9 de enero de 1948 no es una parte válida del laudo, separable de la concesión de paga retroactiva al 9 de mayo de 1947. El resolver nosotros que Farrulla y Torres deberán recibir paga retroactiva al 9 de enero de 1948, equivaldría a alterar o modificar el laudo en cuanto a paga retroactiva, y no simplemente separar una parte válida de una parte nula de un laudo. Updegraff y McCoy, supra, págs. 117–18. Toda vez que la concesión de paga retroactiva no se compone de dos partes separables, toda la disposición en cuanto a paga retroactiva es nula.

 Aun cuando hubiéramos resuelto que la concesión de paga retroactiva al 9 de enero de 1948 podía separarse y ponerse en vigor, la concesión de tal paga retroactiva adolece de otro defecto. Un laudo, por sí solo, sin modificación o aclara-

ción de parte de las cortes, debe resolver definitivamente todas las cuestiones sometidas. 6 Williston, supra, sec. 1929, pág. 5397–8; Updegraff y McCoy, supra, págs. 117, 120, 122, 126; *Maw v. Kitzman,* 214 N.W. 273 (N.D., 1927); *American Trading Co. v. Steele,* 274 Fed. 774, 781–82 (C.C.A. 9, 1921); *McInnish v. Lanier,* 109 So. 377 (Ala., 1926). Esto es así de acuerdo con la teoría de que un laudo pone fin a la controversia entre las partes, sin intervención de las cortes, con excepción de que éstas lo ponen en vigor.

El laudo en este caso no cumple con esta norma en tanto en cuanto concierne la disposición para paga retroactiva. La propia Junta aparentemente se inclina a este parecer. Ha radicado una "moción para que se interprete la decisión del árbitro". El laudo concedió a Farrulla y a Torres "los salarios dejados de percibir" desde el 16 de mayo de 1947. La Junta nos pide ahora que interpretemos ese lenguaje como que exige el pago de "no sólo el salario que realmente ganaban los empleados despedidos, sino también los aumentos sucesivos que por contrato o convenio colectivo hubieren fijado las partes para los empleados de la misma clasificación que los dos empleados envueltos en este procedimiento." La Junta nos pide que resolvamos este punto "con el fin de evitar la multiplicidad de pleitos . . . ". Cita casos en que la Junta Nacional, luego de declarar culpables a patronos de prácticas ilícitas de trabajo al despedir empleados, expresa y claramente dispuso en su resolución la reposición con paga retroactiva calculada en esta forma.

No hemos permitido a la compañía asumir dos posiciones. Habiendo voluntariamente convenido en arbitrar, no puede ahora relitigar ante nos las cuestiones resueltas por el árbitro. La misma regla se aplica a la unión. Trata de beneficiarse con la regla de que el laudo es final y obligatorio. Sin embargo, a renglón seguido nos pide que aclaremos el laudo en cuanto a la paga retroactiva. Si las cuestiones resueltas por el arbitraje no pueden ser relitigadas por la compañía,

tampoco pueden relitigarse por la unión. Debemos dejar el laudo tal cual lo encontramos. Y como el laudo no es claro al resolver finalmente una de las cuestiones sometidas al Comité, es nulo en cuanto a dicha cuestión.

Ésta parece a primera vista una regla dura y técnica en demasía. Pero debe recordarse que uno de los propósitos del arbitraje es alejar la controversia de las cortes. En los méritos, las cortes ponen en vigor los laudos pero no los interpretan.[11]

■ El Comité fué autorizado para resolver la cuestión del tipo de la paga retroactiva bajo el convenio de sumisión. Pudo haber sostenido la destitución; pudo haber suspendido a los empleados por cierto período o pudo haberlos repuesto sin paga retroactiva; pudo haberlos repuesto con paga retroactiva al tipo que percibían cuando se les suspendió; y pudo haberlos repuesto con paga retroactiva a los tipos aumen-

[11] Un ejemplo del requisito inflexible de que un laudo arbitral debe resolver finalmente toda la controversia, nos lo da la regla de que cuando un árbitro ha emitido su laudo, es *functus officio* y no tiene poder o autoridad para alterarlo, en la ausencia de un estatuto o acuerdo en contrario. Anotación, 104 A.L.R. 710; 6 Williston, supra, sec. 1927A, pág. 5390–1; Updegraff y McCoy, supra, págs. 120, 122, 124. En el presente caso el presidente del Comité de Arbitraje correctamente rehusó someter al Comité una moción de reconsideración de la compañía, basada en el caso de *Blanes* resuelto después de emitido el laudo, porque según resuelven los casos, un árbitro da fin a sus funciones cuando emite su laudo.

Asimismo existe un requisito igualmente inflexible al efecto de que un laudo que no se hace dentro del término provisto en el convenio colectivo o en el acuerdo de sumisión es nulo y no puede ser puesto en vigor. Anotación, 154 A.L.R. 1392; *Brotherhood of R. & S. Cl., etc.* v. *Norfolk So. Ry. Co.,* 143 F.2d 1015 (C.C.A. 4, 1944); 6 Williston, supra, sec. 1929, pág. 5395; Updegraff y McCoy, supra, págs. 119–22. El convenio colectivo en este caso provee: "El Comité se reunirá y rendirá su veredicto dentro del término de diez (10) días a partir de la fecha que se originó el incidente, disputa, controversia o reclamación." En este caso no hubo veredicto dentro de dicho período. Sin embargo, la compañía puede creer bien que éste no es lenguaje mandatorio o que renunció a esta disposición solicitando se reabriera el caso para presentar nueva evidencia, luego de haberse cerrado el mismo. De cualquier modo, la compañía no levanta cuestión alguna en cuanto a este punto. Nos parece, sin embargo, que el cumplir con tales convenios evitaría dificultosas cuestiones en relación con largos períodos de paga retroactiva como ocurre en este caso.

tados. Véanse, Comentario, 43 Ill.L.Rev. 847, supra; *Note, Back Pay Orders under the National Labor Relations Act,* 48 Yale L.J. 1265; *Comment, Back Pay Awards under the National Labor Relations Act,* 37 Ill.L.Rev. 441. El Comité no resolvió claramente la cuestión de la paga retroactiva en su laudo. Como no hizo un pronunciamiento final de todas las cuestiones relativas a la paga retroactiva, la concesión de paga retroactiva es nula.[12]

El laudo es válido en cuanto a reposición, pero nulo en cuanto a paga retroactiva. Como hemos visto, el pronunciamiento sobre reposición es separable y por consiguiente puede ponerse en vigor no obstante la nulidad de la disposición de paga retroactiva.

## V

La Compañía arguye que el remedio provisto en el artículo 9(2)(c) es insuficiente. Copiamos al pie de la letra el argumento de la compañía en apoyo de esta contención: "El remedio concedido a una parte por la sección 9(2)(c) de la ley y que faculta a la Junta a requerimiento de parte a entablar acción ante este Tribunal para el cumplimiento de un laudo, es inadecuado e ineficaz. Ello es así porque este Tribunal no revisa el caso en sus méritos y no entra a considerar la evidencia aportada por las partes en el proceso de arbitraje, aun cuando, como en el caso de autos, el árbitro cometió un error de derecho al emitir su laudo. Fué

----

[12] La compañía radicó una contestación a la moción de la Junta para interpretar la decisión del Comité de Arbitraje. Su oposición está basada en el hecho de que suponiendo que Farrulla y Torres han estado desempleados desde mayo 9, 1947, no probaron ante el Comité que hicieron gestiones razonables para obtener otro empleo. En apoyo de esta teoría, la compañía cita casos resueltos por la Junta Nacional.

No podemos considerar esta contención de la compañía. En primer lugar, el récord que tuvo ante sí el Comité no fué elevado ante nos. Por consiguiente, no hay manera de determinar si Farrulla y Torres sometieron o no prueba sobre este punto. En segundo lugar, aun si el récord estuviera ante nos y guardara silencio sobre la cuestión, si la decisión del Comité sobre este punto hubiera sido claramente emitida y por tanto fuera válida, como ya hemos visto, no tendríamos autoridad para revisar en los méritos cuestiones de hecho o de derecho como las que levanta esta contención de la compañía.

por ello que la aquí demandada recurrió a la Corte Federal para el Distrito de Puerto Rico en petición de decreto declaratorio, Caso Civil No. 5210. Dicho caso está aún pendiente ante la Corte Federal y el mismo da oportunidad a todas las partes para la consideración en sus méritos de este recurso.''

Este argumento es algo difícil de seguir. Como hemos visto en la Parte IV, la compañía correctamente expone el limitado alcance de nuestra revisión del laudo de arbitraje. Pero la compañía eligió su ruta y por ella debe seguir. Habiendo convenido en cumplir un laudo de arbitraje, no puede quejarse ahora de que no se le permita relitigar ante este Tribunal la cuestión resuelta por el árbitro. Y no vemos de·qué manera podría la compañía obtener en la Corte Federal que ésta le considere en los méritos la cuestión cuya consideración en los méritos este Tribunal le niega. Bajo las circunstancias de este caso, en ausencia de un estatuto Federal sobre la materia, el alcance de la revisión por las cortes de un laudo de arbitraje es cuestión de ley local. Nuestra resolución en la Parte IV en consecuencia sería tan aplicable en la Corte Federal como lo es en este procedimiento. *De Castro v. Board of Comm'rs,* 322 U.S. 451; *Torres v. Roldán,* 67 D.P.R. 367, 370–71; *Pérez Segovia v. Tribunal de Distrito de San Juan,* 69 D.P.R. 4, 7–8.

Deseamos indicar para terminar que toda vez que la Asamblea Legislativa dispuso el arbitraje de disputas obreras mediante un estatuto traído mayormente de fuentes existentes en los Estados Unidos continentales, hemos concluído que al no fijar las reglas que gobiernan el arbitraje, la Legislatura quiso que fuéramos nosotros los que fijásemos dichas reglas de arbitraje tomándolas de las mismas fuentes. Pero sugerimos que habría más certeza en este campo tan controversial y estaría más afín con las tradiciones del derecho civil, si la Asamblea Legislativa aprobara una ley detallada, igual que lo han hecho tantos estados en relación con esta materia. *Cf.* Gregory, supra, págs. 462 *et seq.* En ausen-

cia de tal estatuto, las partes pueden definir el alcance del arbitraje y fijar las reglas para el mismo en los convenios colectivos y en los acuerdos de sumisión.

*La petición para que se ponga en vigor el laudo de arbitraje será declarada con lugar en tanto en cuanto dispone la reposición de Torres y de Farrulla. Será denegada en tanto en cuanto ordena paga retroactiva.*

El Juez Asociado Sr. Negrón Fernández no intervino.

Opinión disidente del Juez Asociado Sr. Todd, Jr.

Disiento en cuanto a la cuestión discutida y resuelta bajo el número IV, que es la fundamental en el caso, una vez resuelta la cuestión jurisdiccional, por las razones que expongo a continuación.

Después de haber sido absueltos en la Corte Federal, la Unión solicitó la reposición de los dos empleados. La Compañía se negó alegando que después de practicar una investigación de los hechos ''hemos llegado a la conclusión de que los Sres. Torres y Farrulla fueron negligentes en el desempeño de sus deberes y que en su consecuencia no pueden volver a ser empleados por esta compañía.''

La única cuestión sometida a arbitraje por las partes fué la siguiente:

''La Unión pide la reposición de los empleados . . . y además la paga de sus salarios correspondientes a todo el tiempo que permanezcan cesantes. . . .''

De acuerdo con la prueba que tuvo ante su consideración el quinto miembro del Comité de Arbitraje, hizo constar lo siguiente:

''* * * * * * *

''Entrando en los méritos de las contenciones tanto obreras como patronales, todo tiende a demostrar que hubo negligencia. *En eso es que exclusivamente tenemos que entrar para resolver la querella.* En cuanto a si hubo o no acto delictivo o criminal por parte de los querellantes, eso ya fué resuelto favorablemente a los querellantes

por virtud de sentencia del Juez David Chávez de la Corte de Distrito de Estados Unidos para Puerto Rico.

"No vemos por qué debamos exponer razones para demostrar que la negligencia de los querellantes fué debidamente probada. La evidencia tiende así a indicarlo y hasta los querellantes lo admiten en su alegato de 12 de abril de 1948, al aceptar haber cometido Armando Farrulla 'un error de los catalogados como graves en la carta circular del Sr. Calzada,' y el Sr. Miguel Ángel Torres acepta haber cometido 'un error clerical de los catalogados como simples en la circular y que no apareja castigo alguno.' *A todas luces estos llamados errores son actos negligentes, razón par la cual fueron suspendidos por la Compañía con fecha de 9 de enero de 1948.*" (Bastardillas nuestras.)

No obstante ser esa la única cuestión que, a mi juicio, fué sometida a arbitraje—y así parece haberlo entendido el Quinto Miembro—más adelante hace constar:

"	*	*	*	*	*	*

"El Quinto Miembro ha llegado a la conclusión de que la imputación de negligencia hecha a los querellantes por la Compañía en la carta con fecha 9 de enero de 1948, *y la cual hemos sostenido ya que se desprende de la evidencia y alegatos sometidos, no conlleva una suspensión definitiva como empleados de la Compañía para los querellantes. . . .*" (Bastardillas nuestras.)

Para mí es claro que el Comité de Arbitraje actuó sin jurisdicción al resolver, después de haber admitido que la negligencia fué probada, que el despido de los empleados no procedía y que podía, a su antojo, fijar el castigo en una semana de suspensión por el hecho de que, para otra clase de actuaciones negligentes de sus empleados, la Compañía acostumbraba a suspenderles por una semana. Esa cuestión no fué sometida a arbitraje. El propio Quinto Miembro al final del laudo hace constar que:

"	*	*	*	*	*	*

"No habiendo la Corporación querellada entrado a discutir posibles castigos a imponerse, limitándose a exponer que ni siquiera hay lugar a la reposición, lo cual hemos considerado como algo extremadamente excesivo y arbitrario, *no queda otro remedio que castigar*

a cada uno de los querellantes Miguel Ángel Torres y Armando Farrulla *a una semana de suspensión sin paga, ya que no se nos ha otorgado jurisdicción para imponer un castigo mayor. . .''* (Bastardillas nuestras.)

¿En qué parte de la sumisión a arbitraje en este caso se estipuló por las partes que únicamente se le otorgaba jurisdicción al Comité para imponer una semana de suspensión sin paga y que no podía imponer un castigo mayor?

El lenguaje usado y la conclusión a que se llegó en el laudo arbitral demuestran, a mi juicio, que de prevalecer el mismo, en ningún caso puede un patrono despedir a un obrero por actuaciones negligentes que han sido probadas, si a juicio del Comité de Arbitraje lo que procede es una suspensión de una semana—o de un día—sin paga. Probada la negligencia que conlleva actuaciones que ocasionan pérdidas de consideración a la Compañía, como se probó en este caso, dicha negligencia constituye justa causa para el despido. *Blanes* v. *Tribunal de Distrito*, 69 D.P.R. 113. No estoy de acuerdo con que la sumisión de arbitraje en este caso autorizó al Comité a resolver que no obstante haberse probado la negligencia podía determinar a su antojo el castigo a imponer. En cuanto a esto actuó sin jurisdicción. *Ríos* v. *Puerto Rico Cement Corp.*, 66 D.P.R. 470; *Simon* v. *Stag Laundry*, 18 N.Y.S.2d 197, confirmado en 19 N.Y.S.2d 143 (1940);(¹) *Application of MacMahon*, 63 N.Y.S.2d 657, en el cual además de citarse el caso de *Simon* v. *Stag Laundry*, supra, se dice que "Ningún laudo puede sostenerse a base de implicaciones inconsistentes con los hechos", y aquí la implicación de que no hubo justa causa para el despido es inconsistente con los

---

(¹)No veo distinción alguna entre el caso de *Simon* v. *Stag Laundry*, supra, y el que resolvemos. Como se dijo en aquél:

"No podemos estar de acuerdo con la alegación del apelado de que el laudo necesariamente implica que el Árbitro concluyó que el despido fué injustificado. El hecho de que el árbitro impuso una pérdida de cuatro semanas de salario no puede llevar a otra conclusión que no sea la de que el despido no se hizo injustificadamente."

814

hechos, la prueba y la propia conclusión a ese efecto del Comité de Arbitraje.

En el caso de *In re Stockham Pipe Fitting Co. and United Steel Workers*, 1 Labor Arbitration Reports 160 (1946), citado en el artículo *Discharge and Discipline Cases in Labor Arbitration*, 43 *Illinois Law Review* 847, 851, el árbitro, al sostener el despido de dos empleados, hizo constar que la compañía había hecho una investigación imparcial antes de despedirles y que, en ausencia de una demostración clara de discriminación o abuso de discreción, sería una "usurpación de las funciones del patrono" el que el árbitro sustituyera su criterio por el del patrono aun cuando considerara la penalidad muy severa. Eso fué lo que hizo el Comité en el presente caso, usurpar las funciones del patrono sobre una cuestión que no le fué sometida, actuando por tanto, sin jurisdicción. Siendo ésta la conclusión a que llego en cuanto a que no procede la reposición de los empleados, *a fortiori*, tampoco tienen derecho a paga retroactvi.a

A mi juicio la petición debe ser desestimada.

En Reconsideración

Mayo 24, 1949

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

En nuestra opinión del 31 de marzo de 1949 en este caso, ante, pág. 782, declaramos con lugar la solicitud de la Junta de Relaciones del Trabajo para que se pusiera en vigor un laudo de arbitraje en tanto en cuanto éste provee la reposición de dos dependientes de The New York & Porto Rico Steamship Company; pero nos negamos a poner en vigor aquella disposición del laudo que ordenaba paga retroactiva desde el 9 de mayo de 1947, fecha en que estos empleados fueron suspendidos. La Junta nos pide la reconsideración de esta parte de nuestra sentencia negándonos a hacer cumplir el laudo en cuanto a paga retroactiva. Ahora acepta nuestra decisión al efecto de que la paga retroactiva no podía válidamente concederse desde la fecha de la suspensión. Pero alega que debemos modificar nuestra sentencia ordenando paga retroactiva desde la fecha del despido, el 9 de enero de 1948. Su teoría es que el Comité de Arbitraje pudo válidamente hacer tal concesión, que es separable de la disposición de paga retroactiva desde el 9 de mayo de 1947. Nada tenemos que añadir a nuestra opinión a este respecto, y por consiguiente declararemos sin lugar la moción de reconsideración.

■ Sin embargo, argumentando su moción, la Junta indica que nuestra opinión guarda silencio en cuanto a si estos

dos empleados tienen derecho a paga desde el 21 de junio de 1948, fecha en que se emitió el laudo, hasta la fecha en que sean repuestos de conformidad con nuestra sentencia. Creemos que la contestación es obvia. Tal paga retroactiva es una consecuencia inevitable de la confirmación de un laudo de reposición. El laudo aquí envuelto no es nuestro. Fué dictado por el Comité, y se emitió el 21 de junio de 1948. Cuando se pone en vigor, se hace por tanto con efecto a la fecha en que se emitió. Resolver lo contrario permitiría a los patronos emplear las dilaciones de pleitos como un medio para posponer durante meses la fecha de efectividad de un laudo que válidamente ordena la reposición. Nuestra sentencia confirmando el laudo de reposición significa en su consecuencia que la compañía no sólo viene obligada a reponer a estos empleados, sino también a pagarles los salarios dejados de percibir desde la fecha del laudo, el 21 de junio de 1948. *Application of Devery,* 41 N.Y.S.2d 293, confirmado en 55 N.E.2d 370 (N.Y., 1944).

La compañía podría alegar que no debemos llegar a esta conclusión porque ella tenía derecho a oponerse al laudo en tanto en cuanto éste proveía incorrectamente paga retroactiva al 9 de mayo de 1947. Pero, según dijimos en nuestra opinión original, las disposiciones de reposición y paga retroactiva son separables. Si la compañía hubiera querido impugnar solamente la disposición nula de paga retroactiva, pudo haber repuesto a estos empleados sin pagarle la paga retroactiva. Habiendo deliberadamente optado por oponerse al pronunciamiento válido de reposición, la compañía no se puede quejar ahora al ponerse en vigor el laudo desde la fecha en que se emitió.

Creemos propio indicar que al resolver que el laudo será puesto en vigor con efecto a la fecha en que se emitió, no estamos modificando los puntos de vista expresados en nuestra opinión original al efecto de que la disposición sobre paga retroactiva no resolvía todas las cuestiones que se sometieron, ya que no indicaba el tipo de paga para la misma.

En esa etapa del caso, el Comité tenía facultades para emplear diferentes fórmulas en cuanto a la cuestión de paga retroactiva. El no haber indicado claramente qué fórmula debía usarse, fué uno de los motivos para que la concesión fuera defectuosa. Nuestra función de implementar la disposición de reposición es diferente. Contrario a un árbitro, bajo estas circunstancias no tenemos discreción para considerar las varias posibilidades en relación con paga retroactiva o el tipo de la misma. Simplemente ponemos en vigor la disposición sobre reposición a partir de la fecha del laudo. Esto conlleva paga retroactiva para los empleados como si éstos hubiesen sido empleados como dependientes en la forma ordinaria por la compañía desde la fecha del laudo a la fecha de la reposición.

Igual que en órdenes sobre prácticas ilícitas de trabajo donde se ordena paga retroactiva, las cifras exactas que se adeudan pueden determinarse mediante el empleo de la maquinaria administrativa de la Junta, con la cooperación del patrono, cuyas nóminas servirán de base al cómputo final. Véase *Rivera* v. *Junta de Relaciones del Trabajo, et al.*, resuelto en 23 de mayo de 1949. En relación con este punto, deben deducirse no solamente los ingresos netos, si algunos, de hecho devengados por estos empleados en algún otro sitio durante el período envuelto, si que también las cantidades, si algunas, que dichos empleados no ganaron sin excusa alguna en otros empleos disponibles. *Phelps Dodge Corp.* v. *N.L.R.B.*, 313 U.S. 177, 197-200; *N.L.R.B.* v. *Bird Machine Co.*, 174 F.2d —— (C.C.A. 1, 1949); *N.L.R.B.* v. *Draper Corp.*, 159 F.2d 294, 297 (C.C.A. 1, 1947); *Wallace Corp.* v. *N.L.R.B.*, 159 F.2d 952 (C.C.A. 4, 1947); *Berkshire Knitting Mills* v. *N.L.R.B.*, 139 F.2d 134, 141-2 (C.C.A. 3, 1943); *Mine Workers* v. *Eagle-Picher Co.*, 325 U.S. 335. Véanse generalmente, 2 C.C.H. *Labor Law Reporter*, 4ta. ed., pár. 4755; pág. 4979, *et seq.*; Comentario, 37 Ill.L.Rev. 441; Nota, 48 Yale L.J. 1265.

*La moción de reconsideración será declarada sin lugar.*

El Juez Asociado Sr. Todd, Jr., disintió en tanto en cuanto en la opinión en reconsideración se hace depender el derecho de los empleados a paga retroactiva a la fecha del laudo, del hecho de que el mismo "válidamente" ordenó su reposición y del hecho de que la compañía deliberadamente optó "por oponerse al pronunciamiento válido de reposición", por seguir dicho juez considerando que el laudo es erróneo y no podía ordenar válidamente la reposición de los empleados.

El Juez Asociado Sr. Negrón Fernández no intervino.