EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Unión General de Trabajadores<br><br>Recurrida<br><br>v.<br><br>Corporación de Puerto Rico para la Difusión Pública<br><br>Peticionaria | Certiorari<br><br>2006 TSPR 134<br><br>168 DPR \_\_\_\_ |

Número del Caso: CC-2003-0579

Fecha: 23 de agosto de 2006

Tribunal de Apelaciones:

      Región Judicial de San Juan-Panel IV

Juez Ponente:

      Hon. Charles Cordero Peña

Abogado de la Parte Peticionaria:

      Lcdo. George E. Green Rodríguez

Abogados de la Parte Recurrida:

      Lcdo. Edwin Rivera Cintrón
      Lcdo. Andrés Montañez Coss

Materia: Revisión Judicial de Laudo de Arbitraje

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Unión General de Trabajadores

    Recurrida

       v.

                             CC-2003-579

Corporación de Puerto Rico
para la Difusión Pública

    Peticionaria

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico a 23 de agosto de 2006

En este caso debemos revisar un laudo de arbitraje en el que se determinó que la querella presentada por la unión no era arbitrable procesalmente por no haberse presentado dentro del término convenido en el procedimiento de quejas y agravios del contrato laboral, frente al planteamiento de la unión de que el agravio o violación al convenio era de carácter continuo por lo que el referido término no se había inflingido.

I

Los hechos en el presente caso no están en controversia. La Corporación de Puerto Rico para la

Difusión Pública ("la Corporación") suscribió un convenio colectivo (el "Convenio Colectivo") con la Unión General de Trabajadores ("la UGT"), el cual regiría las relaciones obrero patronales a partir del 1ro de enero de 1995 hasta el 31 de diciembre de 1998.

El 8 de julio de 1996, la Corporación nombró al Sr. Miguel Hernández Flores al puesto de operador de equipo de televisión con un salario ascendente a $1,425.00 mensuales. **Dicho nombramiento fue notificado a la UGT el 12 de julio de 1996, mediante copia de la hoja de informe sobre empleados nuevos de la unidad apropiada.** Transcurrido casi un año, el 27 de junio de 1997, la UGT solicitó de la Corporación un desglose de todos los empleados pertenecientes a la unidad apropiada, incluyendo el puesto que ocupaban, el salario que devengaban y la fecha de reclutamiento. **La información requerida fue provista el 17 de julio de 1997, mediante una carta del sub-director de Recursos Humanos de la Corporación.**

A raíz de recibir dicha información, el 4 de agosto de 1997, la UGT --por conducto de su oficial, el Sr. Osvaldo Romero Pizarro-- inquirió del patrono sobre la disparidad en salarios entre los operadores de equipo de televisión nombrados con anterioridad al señor Hernández Flores y éste. Ello, en virtud que todos tenían funciones similares. En contestación a las alegaciones de la UGT, el señor Rivera Rangel indicó que la diferencia obedecía a

factores tales como mayor experiencia o mayor preparación académica.

Insatisfecho con las razones expresadas, **la UGT inició el 18 de septiembre de 1997, el procedimiento de quejas, agravios y arbitraje que proveía el Convenio Colectivo.** Véase, Art. VIII, sec. 2, Convenio Colectivo.[1] La UGT alegó que el patrono incurrió en un trato discriminatorio y violentó varias disposiciones del convenio al reclutar al señor Hernández Flores con un salario básico mayor al de

---

[1] El Art. VIII, sec. 2 del Convenio Colectivo disponía los pasos a seguir para la presentación de una queja o agravio. A esos efectos disponía lo siguiente:

Primer paso:

Cualquier empleado o grupo de empleados a través del delegado de la Unión u Oficial de Servicio de la Unión o por el mismo que se considere perjudicado por alguna acción de la Corporación, **deberá presentar su queja a su supervisor inmediato dentro de siete (7) días laborables de la ocurrencia del hecho que dio margen al agravio.** El supervisor deberá dar su contestación al asunto, presentado ante su consideración, en el término de siete (7) días laborables a partir de la fecha en que se le presentó el asunto.

Segundo paso:

En caso de que el supervisor inmediato no conteste dicha queja, agravio o reclamación, o si habiendo contestado a juicio del empleado o la Unión, dicha contestación no es satisfactoria, el empleado o grupo de empleados, a través del Delegado u Oficial de la Unión radicará por escrito su agravio al Director (a) de Recursos Humanos, dentro del término de diez (10) días laborables a partir de la fecha en que recibió o debió haber recibido la contestación del primer paso. El Director de Recursos Humanos deberá dar su contestación por escrito no más tarde de diez (10) días laborables de habérsele radicado el agravio. (Énfasis nuestro.)

otros empleados en la misma área de trabajo. El 29 septiembre de 1997, el vice-presidente del Departamento de Ingeniería de la Corporación, el Ing. Manuel Collazo, replicó a la unión e indicó que la querella no era arbitrable procesalmente toda vez que la misma fue instada fuera del término de siete (7) días laborables --contados desde la ocurrencia del hecho que dio margen al agravio-- dispuesto por el Art. VIII del Convenio Colectivo.

Inconforme con la determinación del supervisor, la UGT procedió a la segunda etapa de la querella y acudió al Departamento de Recursos Humanos de la Corporación. El sub-director de dicho departamento se reafirmó en lo expuesto anteriormente por la Corporación; es decir, entendió que la querella no era arbitrable por haberse presentado tardíamente.

Luego del trámite interno para ventilar la reclamación, la UGT invocó el proceso de arbitraje ante el Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos. Las partes seleccionaron a la árbitro Sra. Elizabeth Guzmán Rodríguez para que resolviera la controversia. El acuerdo de sumisión convenido fue el siguiente:

> Que la Honorable Árbitro determine si la querella es o no arbitrable procesalmente, esto es, si se radicó dentro de los términos provistos por el Convenio Colectivo entre las partes.

> De determinarse que es arbitrable procesalmente, que la árbitro señale fecha para la vista en los méritos de la presente querella.

Como hemos indicado, la Corporación argumentó que la UGT había incumplido con los términos provistos por el Art. VIII del convenio, pues tuvo conocimiento del nombramiento del señor Hernández Flores y su respectivo salario desde el 12 de julio de 1996, por lo que la querella debió presentarse dentro del término de siete (7) días laborables contados a partir de dicha fecha. En la alternativa, y tomándose como punto de partida el 17 de julio de 1997, fecha en que se le proveyó la información a la UGT sobre los empleados unionados, la acción instada era igualmente tardía.

Por su parte, la UGT sostuvo que la controversia no se materializó sino hasta el 9 de septiembre de 1997 cuando se conoció la posición de la Corporación en torno a la posible disparidad de salarios señalada por la unión.

Atendidos los argumentos de ambas partes, la árbitro concluyó que la UGT había incumplido con los términos dispuestos por el Art. VIII del Convenio Colectivo y, por lo tanto, la querella no era arbitrable procesalmente. Entendió que a partir del 17 de julio de 1997 la UGT tenía la lista de empleados que le había remitido la Corporación, de la cual se desprendía claramente que el señor Hernández Flores recibía una remuneración superior a la de otros empleados de la unidad apropiada. No obstante, la UGT esperó dos meses para presentar la querella, por lo que la misma se presentó tardíamente.

Inconforme con el laudo de arbitraje, la UGT acudió al Tribunal de Primera Instancia donde invocó por primera vez la doctrina de violación o agravio continuo como defensa, frente al señalamiento que la querella no era arbitrable procesalmente por no haberse cumplido con los términos dispuestos en el Convenio Colectivo. El foro de instancia resolvió que la queja se presentó fuera de término y que la doctrina de violación continua no aplicaba; por lo tanto, confirmó la determinación del árbitro.

Insatisfecha nuevamente, la UGT recurrió en revisión ante el entonces Tribunal de Circuito de Apelaciones. Dicho foro acogió el argumento de violación continua. El tribunal determinó que el Convenio Colectivo suscrito entre las partes proveía para la concesión de un salario básico a los unionados y que Hernández recibía un salario mayor a ese básico. Por tanto, cada vez que la Corporación le pagaba a Hernández una cantidad superior a la que le pagaba a los otros unionados violaba el principio de retribución uniforme del convenio y surgía una nueva causa de acción. En atención a lo cual no estaba prescrita la reclamación de la unión. Procedió entonces a revocar el laudo emitido.

De dicha determinación acudió ante nosotros la Corporación mediante recurso de *certiorari.* La Corporación señaló los siguientes errores:

> Erró el Honorable Tribunal de Circuito de Apelaciones al revocar el laudo porque el árbitro no aplicó la doctrina de daño continuo al determinar que la querella no era procesalmente aplicable.

Erró el Honorable Tribunal de Circuito de Apelaciones al Tribunal de Primera Instancia porque no debió fundamentar su adjudicación en una sentencia del Tribunal Supremo.

Expedimos el auto solicitado. Ambas partes han comparecido por lo que estamos en posición de resolver y pasamos a así hacerlo.

## II

### A

Una evaluación de nuestra trayectoria en materia de arbitraje obrero patronal nos revela una marcada deferencia hacia los laudos de arbitraje, ante la clara política pública a favor del arbitraje como mecanismo para dilucidar las controversias obrero patronal. *J.R.T. v. Corp. Crédito Agrícola*, 124 D.P.R. 846, 849 (1989). Tal deferencia se debe, entre otras cosas, a que el arbitraje es el medio más apropiado y deseable para resolver las disputas que surgen de la aplicación e interpretación de los convenios colectivos. Es un mecanismo rápido y menos costoso que los procedimientos judiciales, a la vez que ofrece mayor flexibilidad a las partes. *Pérez v. A.F.F.*, 87 D.P.R. 118, 127 (1963). El mismo contribuye a promover la paz industrial.

A tono con lo anterior, hemos reiterado nuestra norma de auto restricción judicial, por lo que un laudo basado en una sumisión voluntaria está sujeto a revisión judicial sólo si las partes convienen que la controversia sometida

al árbitro sea resuelta conforme a derecho.[2] *Condado Plaza Hotel v. Asoc. de Empleados de Casino*, 149 D.P.R. 347, 349 (1999); *J.R.T. v. Hato Rey Psychiatric Hosp.*, 119 D.P.R. 62, 68 (1987); *J.R.T. v. N.Y. & P.R. S/S Co.*, 69 D.P.R. 782 (1949). No obstante, aun cuando sea permisible la revisión judicial del laudo, no debemos inclinarnos fácilmente a decretar la nulidad de la decisión arbitral a menos que el árbitro haga caso omiso al derecho aplicable. *Rivera v. Samaritano & Co.*, 108 D.P.R. 604, 609 (1979). A tales efectos, no hemos vacilado en enfatizar que "no puede hacerse impunemente caso omiso del procedimiento de arbitraje prescrito en el convenio." *J.R.T. v. A.F.F.*, 111 D.P.R. 837, 840 (1982).

La autoridad del árbitro para atender una controversia queda definida por el lenguaje del convenio colectivo o por el acuerdo de sumisión sometido por las partes. *López v. Destilería Serrallés*, 90 D.P.R. 245, 256 (1964). Entre los asuntos que el convenio puede encomendar al árbitro está la determinación de su propia jurisdicción, conforme los términos mismos del convenio. *J.R.T. v. N.Y. & P.R. Co.*, *supra*. Véase además, *J.R.T. v. Central Mercedita, Inc.*, 94

---

[2] De ordinario, el laudo de arbitraje puede ser impugnado únicamente si se demuestra la existencia de fraude, conducta impropia del árbitro, violación al debido proceso de ley, ausencia de jurisdicción, omisión en resolver todas las cuestiones en controversia que se sometieron o que el mismo resulte contrario a la política pública. *J.R.T. v. Junta Adm. Muelles Mun. de Ponce*, 122 D.P.R. 318 (1988); *J.R.T. v. Hato Rey Psychiatric Hosp.*, 119 D.P.R. 62 (1985); *J.R.T. v. N.Y. & P.R. S/S Co.*, 69 D.P.R. 782, 800 (1949). Salvo claro está, exista una disposición expresa en el convenio colectivo o el acuerdo de sumisión en la que se disponga que el laudo deberá emitirse conforme a derecho.

D.P.R. 502, 507-508 (1967); *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 765 (1983) ("Because the authority of arbitrators is a subject of collective bargaining, just as is any other contractual provision, the scope of the arbitrator's authority is itself a question of contract interpretation that the parties have delegated to the arbitrators.") Véase además, Elkouri & Elkouri, *How Arbitration Works*, ABA, 2003, Sixth Edition, pág. 284.

De otra parte, en un convenio colectivo tanto la unión como el patrono se comprometen a someter las querellas, quejas y otras reclamaciones que surjan sobre la interpretación, implementación y aplicación del contrato laboral, al procedimiento establecido para atender querellas y dentro del los términos fijados para ello en el convenio. D.M. Helfeld, *La jurisprudencia creadora: Factor determinante en el desarrollo del Derecho de arbitraje en Puerto Rico*, 70 Rev. Jur. U.P.R. 1 (2001).

B

En el campo laboral, el concepto de arbitrabilidad se refiere al "derecho del quejoso a que su agravio lo determine el árbitro" así como cualquier impedimento que se interponga en el disfrute de ese derecho. D. Fernández Quiñones, *El arbitraje obrero-patronal*, Forum, 2000, Primera edición, sec. 7.1, pág. 377. La arbitrabilidad tiene dos vertientes la sustantiva y la procesal.

La arbitrabilidad sustantiva se refiere a la interrogante de si conforme los términos del convenio

colectivo, las partes han decidido someter a arbitraje una controversia o agravio en particular. En otras palabras, si la disputa surgida es una que debe ser dilucidada en el proceso de arbitraje. De ordinario y salvo que el convenio colectivo disponga otra cosa, los asuntos de arbitrabilidad sustantiva deben ser resueltos por los tribunales, pues nadie está obligado a someter a arbitraje una controversia si no lo ha consentido previamente. En estos casos, la función del tribunal se limita a determinar si las partes pactaron que la controversia fuera resuelta a través del mecanismo de arbitraje y no a resolver los méritos la controversia misma. *J.R.T. v. N.Y. & P.R. Co., supra,* pág. 803 ("Compete a las cortes y no al árbitro interpretar el convenio de arbitraje con el fin de determinar qué cuestiones fueron sometidas a arbitraje por las partes.") Véase, *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241 (1962).

Por otro lado, cuando la controversia que se suscita se relaciona con el procedimiento o mecanismo establecido en el convenio para atender un agravio o controversia, nos encontramos ante un asunto de arbitrabilidad procesal. El profesor Fernández Quiñónez señala que la arbitrabilidad procesal en esencia, plantea, "si el agravio está maduro para arbitraje conforme los procedimientos establecidos contractualmente." Fernández Quiñónez, *op. cit.*, sec. 4.6B, pág. 236. **Una cuestión típica de arbitrabilidad**

**procesal es si el agravio se presentó dentro del término provisto en el convenio colectivo**. *Íbid*. **Los asuntos de arbitrabilidad procesal son de la ingerencia del árbitro.**

En el caso seminal *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964), el Tribunal Supremo indicó que una vez se determina que, sustantivamente, el agravio o controversia es arbitrable, el asunto de si éste se presentó dentro del término provisto en el acuerdo es de la incumbencia del árbitro. Específicamente se indicó: "Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." 376 U.S. págs. 557-559. En *J.R.T. v. A.F.F.*, 111 D.P.R. 837, 841 (1982), citando a *Wiley*, señalamos que "[s]i la fase sustantiva de una disputa es arbitrable, la regla general es que las cuestiones procesales relacionadas con ella se resuelvan también por el árbitro."

No tan solo es de la ingerencia del árbitro la determinación de si una queja o controversia se presentó a tiempo conforme los términos del acuerdo laboral sino también, cualquier defensa o asunto colateral relacionado o que incida precisamente con ese planteamiento. *E.g., Wiley, supra*, pág. 557 (["Procedural questions include,] whether grievance procedures or some part of them apply to a particular dispute, whether these procedures have been followed or excused, or whether the unexcused failure to

follow them avoids the duty to arbitrate."); *Local Union No. 370 of Int'l Union of Operanting Engineers v. Morrison-Knudsen Co., Inc.*, 786 F.2d 1356, 1358 (9th Cir. 1986) ("Even matters that are 'extrinsic' to the process of interpreting the collective bargaining agreement, such as defenses of collateral estoppel and equitable estoppel, are subject to arbitration"); *Retail Delivery v. Servomation*, 717 F.2d 475, 477 (9th Cir. 1983); *McKesson Corp. v. Local 150 IBT,* 969 F.2d 831, 839 (9th Cir. 1992); *Denhardt v. Trailways, Inc.,* 767 F.2d 687, 689 (10th Cir. 1985); *Chauffeurs, Teamsters and Helpers, Local Union No. 765 v. Stroehmann Brothers Co.,* 625 F.2d 1092 (3rd Cir. 1980). En igual sentido, Crone, *The Continuing Battle Over Procedural Issues: Is it a Decision for the Courts or the Arbitrator?*, 20 Mem. St. U. L. Rev. 145, 152 (1989)("Once the court makes the decision that the dispute is arbitrable, the arbitrator is to decide any 'procedural' questions arising from the dispute that are intertwined with the substantive issues and bear on the disposition of those issues.") De ordinario, no habremos de intervenir con asuntos relacionados con la arbitrabilidad procesal de una controversia, así como con aquellos planteamientos colaterales que incidan sobre ésta.

Por último, es menester indicar que, generalmente, el incumplimiento con los términos y el procedimiento establecido en el convenio conlleva la desestimación de la querella en cumplimiento con la norma que pretende tramitar

las querellas con celeridad y diligentemente.  Así, el tratadista Fairweather, en *Practice and Procedure in Labor Arbitration*, BNA, 1983, Second Edition, pág. 101, indica:

> When a grievance has not been filed within the time limits set forth in the collective agreement, the arbitrator generally will dismiss the claim as nonarbitrable unless the opposing party has waived this procedural defect.  Since the parties have limited the cases which they agree to arbitrate according to the terms of their agreement, the arbitrator has no authority to hear a claim presented too late, because it has not properly entered the procedure and hence has not reached the arbitration 'step'. **Arbitrators have supported the dismissal not only on the ground that the arbitrator must receive authority to hear the grievance claim from the agreement, but also on the ground that the establishment of a time limit reflects the parties' recognition that the grievance matters should be heard promptly and not allowed to fester for long periods permitting evidence to be lost and recollections to be dimmed.** (Énfasis nuestro.)

Fairweather, *op. cit.,* pág. 101.

### III

Como mencionáramos en la relación fáctica anterior, el Artículo VIII del Convenio Colectivo establece el procedimiento a seguir para el trámite de las quejas y agravios, así como para someter la queja al proceso de arbitraje.  La primera etapa del proceso se inicia mediante presentación de una queja ante el supervisor inmediato del empleado por sí mismo o a través del delegado de la UGT, **dentro del término de siete (7) días laborables desde la ocurrencia de los hechos que dieron margen al agravio.**  El supervisor tiene, a su vez, la obligación de emitir su

contestación a la queja dentro de siete (7) días laborables.

El término antes mencionado es **improrrogable y jurisdiccional para todas las partes**, excepto que la Corporación o la UGT, mediante acuerdo suscrito por ambos, decidan extender cualquier plazo, en cuyo caso deberán especificar el nuevo término acordado, conforme dispone el propio Art. VIII, sec. 7, del Convenio Colectivo.

De otra parte, el Convenio Colectivo provee que las decisiones en el laudo del árbitro resolviendo la controversia o asunto será **conforme a derecho**, **final y obligatoria para ambas partes**. Art. VIII, sec. 6, Convenio Colectivo.

Basándose en las disposiciones anteriores, la Corporación alegó que le notificó a la UGT, desde el 12 de julio de 1996, de manera clara y evidente, el nuevo nombramiento del señor Hernández Flores y el salario a ser devengado por éste. Consecuentemente, la unión debió someter su queja dentro de siete (7) días, a partir de esa fecha en que advino en conocimiento de las diferencias de salarios.

Según consta en el expediente, las partes acordaron someter al árbitro la controversia de si la querella era arbitrable procesalmente, esto es, si se presentó dentro de los términos provistos por el convenio. Con ello, confirieron expresamente al tercero imparcial la facultad para dirimir tal controversia y el resultado al cual llegue

el árbitro tiene la característica fundamental de ser final y obligatorio para las partes que acordaron someterse a arbitraje.

En el presente caso, el laudo resolvió que la UGT, indudablemente, tuvo conocimiento de la disparidad en salarios entre los operadores de equipo de televisión desde la notificación del nombramiento del señor Hernández Flores, el 12 de julio de 1996. La unión no actuó en ese momento para impugnar la actuación del patrono. Posteriormente, la Corporación le entregó a la unión otra información que evidenciaba la diferencia en paga y tampoco procedió a presentar su queja al patrono dentro del término de siete (7) días.

A base de lo anterior, no hay duda que la unión incumplió con el término pactado con el patrono para iniciar el procedimiento de quejas y agravios por lo que, de ordinario, la queja no sería arbitrable procesalmente tal y como resolvió el árbitro.

Antes bien, la unión planteó por primera vez ante el foro judicial, la aplicabilidad a este caso de la doctrina de violación o agravio continuo. Con dicho planteamiento se pretende evitar el resultado antes mencionado. Habida cuenta que el Convenio Colectivo entre las partes exige que todo laudo sea conforme a derecho, debemos expresarnos a continuación sobre la referida doctrina.

IV

A pesar de nuestra marcada inclinación a dejar los asuntos relacionados a la arbitrabilidad procesal en manos del árbitro, somos conscientes que no siempre podemos desligar dicha controversia de cuestiones puramente de derecho, en las que sí debemos intervenir, cuando el convenio o el acuerdo de sumisión ordenan que el laudo sea conforme a derecho. Como ya apuntamos, éste es uno de esos casos.[3]

Sólo en una ocasión anterior hemos hecho referencia a la doctrina de violación continua en el ámbito laboral.[4] En *J.R.T. v. A.E.E.*, 113 D.P.R. 564, 567 (1982) se cuestionó la jurisdicción del árbitro por haber caducado la reclamación al transcurrir más de seis meses desde que el empleado era merecedor de un aumento de sueldo por años de servicio. En aquella ocasión, el árbitro resolvió a favor

---

[3] Como indicamos en la relación de hechos que antecede, la defensa de violación o agravio continuo fue presentada por vez primera ante el foro judicial, lo que de ordinario implicaría la renuncia de tal defensa por no haber sido levantada oportunamente durante el proceso de arbitraje. No obstante, el tribunal de instancia y el tribunal apelativo intermedio atendieron en sus méritos ese asunto. Por no presentarse ante nosotros argumentación alguna a los efectos de que la defensa de violación continua fue renunciada por la parte recurrida y toda vez que la misma constituyó el fundamento de los foros judiciales inferiores, en esta ocasión procederemos a analizar el asunto.

[4] En casos relacionados a la responsabilidad civil extracontractual, hemos admitido la existencia de daños continuados y sucesivos, que pueden afectar el transcurso del término prescriptito para este tipo de acción. Véase *Santiago Rivera v. Ríos Alonso*, res. 7 de febrero de 2002, 156 D.P.R. ____, 2002 T.S.P.R. 15; *Galib Grangie v. El Vocero*, 138 D.P.R. 560 (1995); *Rivera Encarnación v. E.L.A.*, 113 D.P.R. 383, 386 (1982); *Arcelay v. Sánchez Martínez*, 77 D.P.R. 824, 838 (1955).

de la arbitrabilidad y, posteriormente, avalamos esa determinación. Al resolver, expresamos, sin mayor exposición, **que el incumplimiento con un aumento de salario por mérito dispuesto en el convenio, era una reclamación de carácter continuo**, por lo que cada vez que el patrono pagaba el salario sin incluir el referido incremento, se configuraba una nueva violación al convenio colectivo.

En Estados Unidos, varios tratadistas en campo laboral reconocen la existencia de violaciones continuas a un convenio, cuyo efecto es renovar el término provisto en el convenio para reclamar bajo el procedimiento de quejas y agravios. Los tratadistas Elkouri, observan lo siguiente:

> Many arbitrators have held that 'continuing' violations of the agreements (as opposed to a single isolated and completed transaction) give rise to 'continuing' grievances in the sense that the act complained of may be said to be repeated from day to day, with each day treated as a new 'occurrence'. These arbitrators permit the filing of such grievances at any time, although any back pay would ordinarily accrued only from the date of filing. For example, where the agreement provided for filing 'within ten working days of the occurrence,' it was held that where employees were erroneously denied work, each day lost was to be considered an 'occurrence' and that a grievance presented within 10 working days of any such day lost would be timely.

Elkouri, *op. cit.*, págs. 218-219.

Así también, el profesor Fairweather señala:

> If the grievant continues to suffer from the alleged contract violation, the arbitrator may find that the violation is a continuing one. In such a case, the limitations period recommences each day; hence, the time for filing the grievance is extended. . . . The 'continuing violation' doctrine is used most frequently by grievants seeking damages because an employer failed to pay the established wage rate for the

employee's classification or failed to grant a
merit increase.

Fairweather, *op. cit.*, pág. 86.

La tarea de decidir cuándo el agravio es de naturaleza continua es una delicada. La limitación temporal dispuesta en un convenio colectivo para iniciar un proceso de quejas y agravios es, de suyo, de suma importancia. La misma tiene como objetivo ponerle fin a las disputas obrero patronales rápidamente para de esa forma propiciar la paz industrial. Por lo tanto, los plazos dispuestos en los convenios colectivos obedecen a un evidente interés público. De ordinario entonces hay que cumplir con los mismos rigurosamente.

La doctrina de violación continua se configura como una excepción a la norma general que presupone el cumplimiento específico de los términos negociados por las partes y recogidos en el convenio colectivo. Como ya indicamos, una violación de carácter continuo hace que el agravio surja o se renueve periódicamente y, por tanto, se pueda presentar la querella en cualquier momento mientras persista la violación. Para establecer si la querella es de naturaleza continua lo determinante no es la continuidad del agravio, si no más bien, si al momento de presentar la querella correspondiente la violación persiste. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). ("But the emphasis should no be placed on mere continuity; the critical question is whether any present **violation** exists.") (Énfasis en original.)

> Así, para establecer si aplica la doctrina a una situación en particular es necesario evaluar, **únicamente**, el acto que motivó la queja del empleado, sin considerar los efectos continuos de la violación pasada.[5] Véase, Bloch, Arbitration: Time limits and continuing violations, 96 *Mich. L. Rev.* 2384 (1998).

La pregunta que debemos hacernos es ¿cómo podemos satisfactoriamente distinguir entre violaciones que son, en efecto, nuevos agravios y aquéllas que son meras manifestaciones de la violación original? Sólo las primeras configuran una verdadera violación continua con su evidente efecto interruptor.

Para ello debemos enfocarnos en actuaciones nuevas e independientes que podrían ser violatorias del contrato laboral sin ningún nexo o referencia a eventos pasados. Véase, *Monee Nursery v. Internacional Union*, 348 F.3d 671 (7th Cir. 2003)("This court, when determining whether a subsequent incident was properly part of a continuing violation, has asked whether it was 'based upon' the earlier action."); *Calloway v. Partners National Health Plans*, 986 F.2d 446 (11th Cir. 1993); *Metz v. Tootsie Roll*, 715 F.2d 299, 305 (7th Cir. 1983).

En el ámbito del derecho laboral norteamericano, se ha reconocido que la doctrina de violación continua aplica cuando se reclama por los daños causados como resultado de la negativa patronal de remunerar al empleado en la proporción establecida en la clasificación a la que fue

---

[5] A manera de ejemplo, el juzgador en un caso sobre despido, se fija en el acto mismo de la cesantía, más no en que cada mes dicho empleado deja de recibir su salario.

asignado y a la cual tiene derecho según el convenio; o, cuando no se le otorga un aumento de salario por mérito conforme dispone el convenio. Fairweather, *op. cit.*, pág. 104. Es de notar que en ambas situaciones el trabajador tiene un derecho a que se le pague dicha remuneración por lo tanto, se entiende que cada vez que recibe un pago que no refleje el salario a que tiene derecho se configura una nueva violación por lo cual puede reclamar. Véase, *In re U.S. Dept. of Air Force*, 115 L.A. 1685 (Nolan 2001)("in the case of an erroneous pay dispute, a new grievance may arise with any pay dispute"); *In re Independent School District No. 23*, 110 L.A. 1117 (Daly 1998); *In re Harding Galesburg Markets, Inc.*, 103 L.A. 1159 (Daniel 1994). De ahí que en *J.T.T. v. A.E.E., ante*, aplicáramos la doctrina de violación continua pues conforme el convenio colectivo aplicable en ese caso, el empleado tenía derecho a recibir un aumento de salario automático por años de servicio.

En el campo laboral, la doctrina de violación continua no opera automáticamente pues se exige lo siguiente: primero, que el tiempo transcurrido entre el momento en que expiró el plazo, y cuando en efecto se presentó la correspondiente queja o agravio, no haya sido excesivo; segundo, que haya justa causa para la dilación y así lo demuestre el querellante; y tercero, que la tardanza no perjudique al patrono al dificultar severamente su capacidad para defenderse de la querella presentada. En tal sentido se ha resuelto lo siguiente:

> Ordinarily, arbitration provides a limited form of forgiveness in the case of recurring or continuing grievance by permitting the dispute to be heard of the merits, but restricting any remedy plea to the actual date of filing . . . The continuing grievance exception to a late filing is no automatic however.  The exception requires that the grievance meet the following conditions: 1. **The time elapse between the expiration of the filing deadline and actually filing is no unreasonably protracted. 2. The grievant offers a good and sufficient reason for the late filing. 3. The late filing poses no undue burden or prejudice to the employer in defending against the grievance.** (Énfasis nuestro.)

*In re Independent School District No. 23, ante*, pág. 1120.

En igual sentido, *In re Aramark Services, Inc*. 115 L.A. 401, 406 (Hoh 2000).

Ateniéndonos a las normas legales antes expuestas, analicemos las cláusulas aplicables del Convenio Colectivo suscrito por las partes y los hechos del presente caso.

IV

A

En este caso, la UGT objetó el salario que le fue otorgado al señor Hernández cuando se le reclutó para un puesto de operador de equipo de radio y televisión en la Corporación, por ser dicho salario superior al de otros empleados en su misma clasificación.  La UGT indicó que la acción de la Corporación era discriminatoria y en violación del Convenio Colectivo.  Señaló que debido a ello, los demás empleados tenían derecho a que sus salarios se nivelaran de suerte que estuvieran a la par con el del señor Hernández.  Sostuvo, al igual que el foro apelativo intermedio, que cada vez que la Corporación le paga al

señor Hernández su salario "surg[ía] nuevamente una causa de acción en beneficio de los empleados unionados que no están retrubiodos (sic) uniformemente", por lo que aplicaba en este caso la doctrina de violación continua.

La Corporación por su parte, negó que su actuación violara el Convenio Colectivo. Indicó que éste nada proveía respecto el salario de nuevos reclutamientos; que el asunto del salario del señor Hernández era un asunto de orden administrativo y como tal, y a tenor con el Convenio Colectivo, de su exclusiva incumbencia. Adujo que a la fecha de su reclutamiento, el señor Hernández tenía vasta experiencia ya que había trabajado para otra cadena televisiva por espacio de nueve años por lo que superaba en experiencia a los otros empleados. En resumen, concluyó indicando que el reclutamiento del señor Hernández redundaba en beneficios para la Corporación y el servicio público que ésta presta. Apuntó, que no aplicaba la doctrina de violación continua toda vez que la concesión de un salario de reclutamiento no era un asunto cobijado por el Convenio Colectivo.

El fundamento medular del reclamo de la unión en este casos es que cada vez que el señor Hernández recibe su salario en exceso, alegadamente, de lo permitido por el Convenio Colectivo, surge una nueva causa de acción a favor de los otros empleados por éstos no recibir la misma retribución. Esta alegación supone que, de determinarse que en efecto el salario concedido al señor Hernández fue

violatorio del Convenio Colectivo, los demás empleados tienen un derecho a que se nivele sus salarios al mismo nivel del que ostenta el señor Hernández. Sólo de esta forma cabe hablar que se les violó un derecho que ellos tenían bajo el convenio, el cual se renueva cada vez que no reciben lo que tenían derecho a recibir, o cuando el señor Hernández recibe el de él.

Hemos estudiado detenidamente el Convenio Colectivo, prestando particular atención a las cláusulas invocadas por la unión, y no hemos encontramos nada que nos permita inferir que las partes pactaron que en situaciones de esta naturaleza, operaría el derecho a nivelar y como tal, se igualarían los salarios. Por lo tanto, no cabe hablar de que se ha violado derecho alguno reconocido en el Convenio Colectivo por el cual tengan derecho a reclamar. Adviértase que en última instancia, el reclamo de los otros empleados es contingente al derecho que pueda o no pueda tener el señor Hernández a su salario.

B

La unión invocó, de forma general, el derecho a retribución uniforme como base para su reclamación indicando que el salario mayor del señor Hernández violaba ese principio. Veamos brevemente.

El Art. XXXII del Convenio Colectivo dispone que la Corporación preparará un Plan de Clasificación de Puestos y de Retribución Uniforme sobre los puestos unionados en la Corporación. Un plan de clasificación, en términos

generales, constituye un sistema de valoración de puestos y se utiliza para valorar equitativa y sistemáticamente todos los puestos en una organización. De esta forma se propicia que éstos puedan ser compensados de forma justa y equitativa. Véase para una amplia discusión, S. Hays, R. Kearney, Public Personnel Adminsitratrion, Prentice Hall, New Jersey, 2003; H. Risher, C. Fay, New Stratergies for Public Pay, Jossey-Bass, San Francisco, 1997.

El plan de retribución por su parte, constituye el mecanismo que utiliza la organización para fijar y administrar los salarios, bonos, incentivos económicos que se le conceden al empleado. La estructura salarial o escalas de sueldo y las normas que se aplican son parte de dicho plan. La asignación de las clases a las distintas escalas salariales entrelaza el plan de clasificación con el plan de retribución.

Como norma general, cada escala salarial tiene un tipo retributivo mínimo y uno máximo. Ello implica que todos los empelados en puestos de una misma clase reciben el mismo salario, excepto cuando hayan recibido aumentos por motivo de antigüedad o por méritos, o algún incentivo especial, como por ejemplo, por estudios o por años de experiencia.

Por lo tanto, el hecho que un empleado en una clase reciba un salario mayor que otro empleado en su misma clase no significa que automáticamente se ha violado el principio de retribución uniforme.

C

Por otro lado, e independientemente de lo previamente señalado, la actuación de la Corporación que ocasionó la alegada disparidad de salarios entre los operadores de equipo de televisión se llevó a cabo el 8 de julio de 1996 cuando reclutó al señor Hernández Flores y le fijó una remuneración mayor.  La UGT no puede invocar actuaciones discriminatorias de la Corporación, sin necesariamente referirse al hecho único del nombramiento.  Esto es, la alegada desigualdad en el pago de salarios es el efecto incidental que creó la actuación del patrono al nombrar al señor Hernández Flores con un salario base mayor al de otros en igual puesto.  La doctrina invocada por la unión no protege las manifestaciones continuas que surjan del acto alegadamente ilegal.

Diferente sería si nos encontráramos ante un empleado con derecho a recibir un aumento de sueldo por mérito, el cual cada vez que recibe su cheque tiene una acción independiente para recibir el incremento en salario, ello sin necesidad de hacer alusión a los pagos anteriores. Tampoco ha alegado la unión que la referida heterogeneidad constituye un discrimen por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas, a tenor con la Constitución del Estado Libre Asociado de Puerto Rico.  En virtud de lo anterior, corresponde que deneguemos la aplicación de la doctrina de violación continua a la presente situación de hechos.

V

En virtud de lo anterior, y conforme discutimos previamente, la reclamación de la unión se instó fuera del término dispuesto en el Convenio Colectivo por lo que no era arbitrable procesalmente. Procede entonces revocar la determinación del Tribunal de Apelaciones y confirmar al Tribunal de Primera Instancia.

Se dictará sentencia de conformidad.


                                    Anabelle Rodríguez Rodríguez
                                           Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Unión General de Trabajadores

    Recurrida

      v.

                                      CC-2003-579

Corporación de Puerto Rico
para la Difusión Pública

    Peticionaria


SENTENCIA

San Juan, Puerto Rico, a 23 de agosto de 2006

    Por los fundamentos expuestos en la Opinión que antecede, los cuales se incorporan íntegramente a la presente, se revoca la determinación del Tribunal de Apelaciones y se confirma al Tribunal de Primera Instancia.

    Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri disiente con opinión escrita a la cual se une la Jueza Asociada señora Fiol Matta.


                  Aida Ileana Oquendo Graulau
                Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Unión General de Trabajadores

    Recurrida

      v.                      CC-2003-579    Certiorari

Corporación de Puerto Rico
para la Difusión Pública

    Peticionaria

Opinión Disidente emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI, a la cual se une la Juez Asociada SEÑORA FIOL MATTA.

San Juan, Puerto Rico, a 23 de agosto de 2006.

Como muy bien señala la mayoría del Tribunal en su opinión, el término fijado en un convenio colectivo para iniciar un proceso de quejas y agravios persigue el fundamental objetivo **de "ponerle fin a las disputas obrero patronales rápidamente para de esa forma propiciar la paz industrial".**

No cabe duda que en nuestro país, la política pública imperante desde hace muchas décadas en el campo de las relaciones obrero-patronales ha sido la de propiciar **"una razonablemente pacífica y fructífera paz industrial, . . . cosa que se considera deseable por ser útil y justa".** <u>Nazario v. Tribunal</u>

<u>Superior</u>, 98 D.P.R. 846, 851 (1970). Véanse, además, <u>J.R.T. v. Junta Adm. Muelle Mun. de Ponce</u>, 122 D.P.R. 318, 333 (1988); <u>U.I.L. de Ponce v. Dest. Serrallés, Inc.</u>, 116 D.P.R. 348, 352 (1985); <u>Pérez v. Autoridad Fuentes Fluviales</u>, 87 D.P.R. 118, 124 (1963); <u>P.R. Telephone v. Junta Rel. Trabajo</u>, 86 D.P.R. 382, 395-396 (1962). Se ha procurado sobre todo **"eliminar en lo posible las disputas obreras. . ."**. <u>Morales González v. J.R.T.</u>, 121 D.P.R. 249, 270 (1988), por estimarse que tienen el potencial de "poner en peligro la vida misma de la comunidad por sus efectos nocivos en la estructura básica de su economía. . .". <u>Jta. Rel. del Trabajo v. I.L.A.</u>, 73 D.P.R. 616, 644 (1952).

En el caso de autos, encaramos la acción de una unión que evidentemente procuró honrar la fundamental política pública aludida antes. La Unión General de Trabajadores (en adelante UGT) actuó conforme a lo requerido para mantener la paz industrial: **no se precipitó a fraguar una disputa laboral.** Sin embargo, la mayoría del Tribunal en su decisión en el caso de autos falla en apreciar correctamente el referido proceder de la unión. Veamos.

La UGT se enteró del nombramiento por el patrono, la Corporación de Puerto Rico para la Difusión Pública, de un operador de equipo de televisión a quien se le concedió un salario superior al que tenían otros operadores de tal equipo nombrados anteriormente por dicho patrono. **La unión procedió entonces a preguntarle al patrono sobre la justificación para tal disparidad salarial.** Inquirió por qué, si todos los

operadores referidos tenían funciones similares, se le había otorgado al último operador que la compañía había contratado un salario superior al de los otros operadores que ésta ya empleaba. La compañía contestó el cuestionamiento referido y dio sus razones para la disparidad salarial referida **el 9 de septiembre de 1997.** El 18 de septiembre de 1997, **sólo siete días laborables después de que la compañía contestara la indagación de la unión**, la UGT presentó la correspondiente queja sobre el particular, e inició así el procedimiento de arbitraje provisto en el convenio colectivo existente entre la compañía y la unión.

Hoy una mayoría del Tribunal resuelve que la queja en cuestión se presentó **tardíamente** y que por ello **no era arbitrable.** Decreta la mayoría del Tribunal que la queja referida tenía que ser presentada dentro del término de siete días laborables, **contados a partir del momento en que a UGT se enteró de la disparidad salarial en sí.**

Este dictamen me resulta enteramente incomprensible. Troncha la ingente política pública mencionada antes que preconiza el logro de la paz industrial. Impone una interpretación al término para presentar quejas e iniciar el arbitraje del convenio colectivo que da al traste con la evidente razonabilidad de la conducta de la unión en este caso.

Nótese que en el momento cuando la UGT se enteró de la disparidad salarial existente entre los operadores de equipo de televisión empleados por la compañía, **todavía no existía**

**ninguna controversia ente la unión y el patrono. El asunto no había madurado aún porque la UGT desconocía qué motivos había tenido la compañía para pagarle, al último operador que había contratado, un sueldo superior al que le pagaba a los operadores que ya empleaba. Es sólo al enterarse la unión de las razones ofrecidas por la compañía para justificar la disparidad salarial que surge la disputa laboral.** Y lógicamente es sólo en ese momento que empieza a transcurrir el término en cuestión. No podía comenzar a cursar dicho término antes sencillamente porque aún la UGT no tenía motivo para diferir del patrono. **No fue la mera disparidad salarial lo que provocó la disputa laboral, sino la justificación que ofreció el patrono para tal disparidad.**

Es evidente que hubiese sido un grave desmán que la unión protestase la disparidad salarial efectuada por el patrono sin antes indagar qué razones tuvo el patrono para hacer lo que hizo. La unión, pues, actuó razonablemente al indagar sobre el asunto antes de formular su querella. Hoy una mayoría del Tribunal castiga la acción eminentemente legítima de la UGT, decretando erróneamente que la unión violó en este caso el término que fija el convenio colectivo para presentar querellas. Se trata de un decreto por puro *fiat* de este Foro, que en nada promueve la paz industrial. Por todo ello yo DISIENTO.

JAIME B. FUSTER BERLINGERI
Juez Asociado